STATE of Missouri,
Plaintiff-Respondent,

v.

Floyd Ray MASON, Defendant-Appellant.

No. 39522.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 9, 1979.

Forriss D. Elliott, M. Barry Forman, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Steven Scott Clark, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

STEPHAN, Presiding Judge.

Defendant Floyd Ray Mason appeals from a conviction of second degree burglary and sentence of two years in prison. He presents seven points on appeal. Finding one to have merit, we reverse and remand and discuss such others as are likely to arise on retrial.

On March 2, 1977, Paul Pugh left his combination residence-furniture store at 4301 North Twentieth Street in the City of St. Louis about 7:30 p. m. and returned about 10:00 p. m. to discover it had been burglarized. A window in the door to the residence on the second floor had been broken and items of value such as tape decks, stereos and television sets had been removed from both the residence and Mr. Pugh's store on the first floor. The burglary was witnessed by three young brothers,

Floyd, James and Isaac Chaney. Floyd, age 12 at the time of trial, and James, age 10, testified. The state elected not to attempt to qualify Isaac, age 8. The testimony of Floyd and James, while not identical on all points, was in substantial agreement: At about 9:00 p. m. on the night in question they were walking from their home the short distance to their grandmother's home, a route that took them past the Pugh residence and store. They heard glass breaking. Investigating, they ran to the rear of the building where they saw a tall, thin black man breaking the window of the second floor door. He entered the building and then opened the front door of the store for a short, fat black man, whom they identified as the defendant. The boys watched the two men turn on the inside lights and make several trips carrying items such as those later reported missing by Mr. Pugh to a yellow pickup truck which had on it splotches of brown paint and racks made of pipe. The men then departed in the truck.

Defendant, a building contractor, had been doing some work at a residence near the site of the burglary. During the evening following the crime, Mr. Pugh saw the defendant and another man near a truck such as that described by the boys parked in an alley behind the Pugh residence. He approached them to inquire whether they knew anything of the burglary. Before he could engage them in conversation, the defendant seized his companion by the arm and said, "Don't talk to him; he knows what is going on." Apparently, there then ensued an incident of flourishing a deadly weapon (all discussion of which occurred out of the hearing of the jury), for which defendant and the companion were subsequently arrested on March 5, 1977, and taken into custody. That evening Mr. and Mrs. Pugh identified defendant and the other man as the persons involved in the flourishing incident; the three Chaney boys also viewed the eight-man lineup, and Floyd and James identified defendant as a participant in the burglary. At the conclusion of the lineup, defendant and the second man were advised that they were also under arrest for burglary and advised of their rights.

The defendant presented a defense of alibi. He claimed that he was drinking at one of two bars on the night in question. The owner of one of those bars, Charles Rieves, testified that he remembered the defendant's presence in his bar from 8:00 p. m. to 1:30 a. m. on the night of the burglary; a date which he recalled with certainty because on March 2 he sponsored his first "happy hour." Rieves testified that defendant was a loyal patron and close friend and that he knew defendant was present at his bar on March 2 because the defendant was about the only person to whom he talked while tending bar.

Lorine Johnson gave the only other testimony in defendant's case. Lorine, the sixteen-year-old daughter of a neighbor of the Pughs, testified that the defendant had performed contracting work for her mother on the day of the burglary as well as for several days thereafter. Lorine spent the evening of the burglary a few doors down from the Pughs' on her aunt's porch but she saw neither the defendant nor his truck. She stated, however, that she had seen a man named Lawrence who resembled the defendant in the neighborhood around the day of the burglary.

■ We advert first to defendant's meritorious assignment of error to the effect that the verdict was the product of undue coercion by the trial court. After the jury had deliberated for six hours, the trial court recalled the jury to ask how they stood numerically without inquiring "how many votes for this proposition, or how many for that." After the foreman informed the court that the count was eleven to one, the court read MAI–CR 1.10, the so-called "hammer instruction." One hour and fifteen minutes later, the court again summoned the jury and inquired as to their progress. In response to a question from the court, the foreman stated that the vote was still eleven to one. The following interchange between the court and the jury occurred:

"THE COURT: As the foreman of the jury, do you feel that if we were to, say,

go another fifteen minutes, that a verdict could be reached? Do you think that reasonable, or does it seem unlikely?

THE FOREMAN: It is possible.

THE COURT: Do you think it is probable? Consider it's been seven hours and fifteen minutes now since the jury got this case. Do you think—

THE FOREMAN: I think if we talk over perhaps one more time, after reading Instruction 11[1] and you feel that a verdict should come out.

THE COURT: Do you think if you had another fifteen minutes you might reach a verdict? Is that correct?

THE FOREMAN: It is possible.

THE COURT: All right. Sheriff, would you take the jury back upstairs, and we will try it another fifteen minutes."

Fifteen minutes later the jury returned with a verdict of guilty and assessed the minimum punishment of two years. Although defendant did not object to the colloquy between the trial court and the foreman at the time it occurred, the point was presented in the motion for new trial and briefed on appeal. We review it under the plain error doctrine, Rule 27.20(c), because the extra-MAI statements "go to the heart of the judge-jury relationship as it affects the fundamental right to a fair and impartial trial." *Burroughs v. United States*, 365 F.2d 431, 434[6] (10th Cir. 1966).

While it is clearly proper to give MAI–CR 1.10 "when appropriate, after extended deliberation by the jury," Rule 20.02(a), we believe that the totality of the circumstances under which the verdict here was reached mandates reversal and remand for a new trial. In *Burroughs v. United States, supra,* the court reversed a conviction in a case in which an *"Allen"* instruction[2] was properly given but the trial court urged the jury to arrive at its verdict within another thirty-five minutes of deliberation. There, the Tenth Circuit said, "it is one thing to recall the jury to beseech them to reason together, and it is quite another to entreat

them to strive toward a verdict by a certain time." Id., 434. Moreover, the setting of the fifteen minute "deadline" in the instant case was exacerbated by the atmosphere created by the colloquy between the trial judge and the foreman. After the court asked whether a verdict was "probable" and pointed out that the jury had been out for seven hours and fifteen minutes, the foreman responded with the words, "I think if we talk over perhaps one more time, after reading Instruction 11 and *you feel that a verdict should come out."* The emphasized portion of the foregoing clearly indicates the foreman understood that the court was requiring that the case be decided. The court did nothing to dispel that understanding, and its lack of action in this regard commended that understanding to the entire jury. Thus, although MAI–CR 1.10 was properly given, the imposition of a fifteen minute time limit, and the trial court's virtual directive that a verdict be reached, cumulatively mandate reversal and remand. Accord, *United States v. Amaya,* 509 F.2d 8, 10–11 (5th Cir. 1975); *Goff v. United States,* 446 F.2d 623, 626–627 (10th Cir. 1971).

Defendant asserts that the trial court erred in not suppressing the evidence concerning both the out-of-court and in-court identification by the Chaney brothers because: (a) requiring defendant to appear in the second lineup was tantamount to arresting him without probable cause or, in the alternative, deprived him of Fourteenth Amendment rights to a determination by a neutral magistrate that a "well grounded suspicion" existed that he had committed the burglary; (b) conducting the second lineup without the benefit of counsel violated defendant's right to the assistance of counsel; and, (c) the second lineup was unnecessarily suggestive. We find no merit in any of these arguments.

■ Defendant's first argument must fail for the reason that, as he admits in his

---

1. The "hammer" instruction had been numbered 11.

2. The *"Allen"* instruction is quite similar to MAI–CR 1.10. See *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

brief, he was in lawful custody on the flourishing charge at the time the lineup occurred. *State v. Radford,* 559 S.W.2d 751, 752 (Mo.App.1977). The basic concept of an arrest is the taking into custody; it would be superfluous to require another arrest of one already in custody before placing him in a lineup. *Rigney v. Hendrick,* 355 F.2d 710, 713 (3rd Cir. 1965), cert. denied 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed.2d 685 (1966). We also reject defendant's alternative argument that he was entitled to a determination by a neutral magistrate that a "well grounded suspicion" existed that he committed the burglary before he could be required to participate in the lineup viewed by the Chaney brothers. Defendant's argument in this regard is based on *State v. Foy,* 146 N.J.Super. 378, 369 A.2d 995 (1976), which imposed such a requirement with respect to unconvicted pretrial detainees being placed in lineups for possible identification as perpetrators of crimes unrelated to those for which they were being held. The New Jersey court reasoned that since a person free on bail could not be required to take part in a lineup unless grounds existed for his arrest for the unrelated crime, it was a denial of equal protection to require a prisoner who could not post bail to take part in a lineup. While the *Foy* argument presents surface plausibility, we are not persuaded by it. Rather, we think the case of *Rigney v. Hendrick, supra,* in which similar arguments were advanced offers a far more practical solution. As pointed out in *Rigney,* a suspect may be put under surveillance regardless of whether he is or is not in custody. The use of a lineup in the case of a pretrial detainee is a reasonable method to allow the suspect to be viewed while providing for the security of witnesses and minimizing disruption of institutional order. As did the court in *Rigney,* we find no violation of any of defendant's Fourteenth Amendment rights in the procedure used in this case.

■ With respect to defendant's claim that he was denied the assistance of counsel at the lineup in violation of his Sixth and Fourteenth Amendment rights, we note there was substantial evidence at the hearing on the motion to suppress from which the trial court could and did find that defendant was offered counsel but waived the opportunity to receive such assistance. Although defendant contends that the contrary appears from the record, we need not decide the issue on this basis, for the right to counsel attaches only after adversary proceedings have been initiated against a defendant. "It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Kirby v. Illinois,* 406 U.S. 682, 689–690, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 418 (1972). Accord, *State v. Chavez,* 483 S.W.2d 68, 69 (Mo.1972). As noted, defendant was in custody on the flourishing charge at the time the Chaney brothers viewed the lineup, which occurred immediately after Mr. Pugh's viewing. Defendant was not arrested for the burglary until after he was identified by the Chaneys; he had no absolute right to counsel at the time of the second lineup in connection with the burglary.

We likewise reject the argument that the lineup was unnecessarily suggestive and thus violated defendant's due process rights. Defendant bases this claim on his speculation that the boys were young, impressionable, excited about having witnessed a burglary, and identified defendant in the lineup because they had seen him in the neighborhood before and not because he was one of the burglars.

■ In determining a claimed violation of due process in the conduct of identification procedures, we must look at the "totality of the surrounding circumstances." *Coleman v. Alabama,* 399 U.S. 1, 4, 90 S.Ct. 1999, 2000, 26 L.Ed.2d 387, 393 (1970); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967). If a lineup is "unnecessarily suggestive and conducive to irreparable mistaken identifi-

cation" it violates the due process clause of the Fifth and Fourteenth Amendments. *Kirby v. Illinois,* 406 U.S. 682, 691, 92 S.Ct. 1877, 1883, 32 L.Ed.2d 411, 418 (1972). The transcript fails to reveal and the defendant makes no claim of any misconduct by the police. Patrolman William J. Gieson presented defendant and his cohort in a lineup with six other persons. He had interviewed each of the three Chaney boys separately prior to the viewing and kept them apart during and after the viewing. The only other person who talked to the boys was a detective who told each of them not to be nervous. Gieson instructed each to view all of the subjects in the lineup to see if he could identify anyone whom he had seen the night of the burglary. Both Floyd and James Chaney identified the defendant as one of the two burglars. James Chaney specifically testified that he identified the defendant because he had broken into the Pughs' premises and *not* because James had previously seen the defendant in the neighborhood. In light of the record and the fact that defendant's argument is nothing more than mere speculation, we hold that under the "totality of the circumstances" the identification procedures were not unnecessarily suggestive nor conducive to irreparable mistaken identification and therefore were consistent with the requirements of due process.

▮ As his next point, defendant submits that the trial court erred in excluding the testimony of a defense witness which related to the possible misidentification of the defendant. As explained earlier, Lorine Johnson testified that she had seen a man named Lawrence in the neighborhood sometime around the day of the burglary and that Lawrence resembled the defendant. After this statement the Assistant Circuit Attorney approached the bench and stated that he believed the defense counsel was going "far afield as far as asking in a black neighborhood. This is a fishing expedition." The court responded to such remarks by interrupting the defense counsel's attempt to support his line of questioning and sustaining the Assistant Circuit Attorney's objections. The defense counsel resumed the trial without making an offer of proof.[3]

Absent an offer of proof, it is impossible for us to determine whether the trial court clearly abused its discretion in excluding further testimony from Ms. Johnson. Such is the test with respect to error claimed in the exclusion of evidence. To preserve the exclusion of evidence for review, "it is essential that a proper question must be asked, and, on objection thereto, an offer must be made at the time showing what evidence will be given if the witness is permitted to answer, the purpose and object of the testimony sought to be introduced, and all facts necessary to establish the admissibility of the evidence." *State v. Harlston,* 565 S.W.2d 773, 783 (Mo.App.1978). There being no offer of proof as to what the testimony would have been, we have no choice but to affirm the trial court's ruling on the matter. *State v. Robinson,* 556 S.W.2d 73, 74 (Mo.App.1977). However, on retrial, defendant will have an opportunity to correct this deficiency.

---

**3.** "Q  Lorine, had you ever seen anyone in the neighborhood during this period of time who resembles Floyd Mason?

A  Yes.

Q  Do you know his name?

A  His name is Lawrence. I do not know his last name.

MR. COWIN [Assistant Circuit Attorney]: Your Honor, may I approach the bench?

THE COURT: You may.

[Thereupon the following colloquy ensued among the Court and counsel, at the bench, out of hearing of the jury:]

MR. COWIN: I believe he is going far afield as far as asking in a black neighborhood. This is a fishing expedition. I could name people in the Circuit Attorney's office who resemble this defendant.

MR. JOHNSON [Defense Attorney]: Your Honor, there are cases that if—

THE COURT: I am going to sustain the objection.

MR. COWIN: I think anybody could get a witness who states there are a hundred thousand people who would—

THE COURT: I am going to sustain the objection.

[Thereupon the trial resumed within the hearing of the jury  .  .  .]"

Defendant next alleges that the court committed "clear error" when it permitted the Assistant Circuit Attorney to argue that defendant's failure to produce witnesses in his own behalf for the police or grand jury was evidence of defendant's guilt. Specifically, the defendant complains of two instances: one occurring during cross-examination of the defendant wherein the Assistant Circuit Attorney asked:

> ". . . how could this case have gotten this far if you had a man who could testify that you were there the entire night? How could this case have gotten this far? Why didn't you go to the police with this man?"

and one occurring during final argument wherein the Assistant Circuit Attorney argued:

> "Then he [defendant] brings on Mr. Rieves, a friend. I guess he is a friend. This case had been going on for three months, and Mr. Rieves didn't have the courtesy to come down to the grand jury and testify on behalf of the defendant. Why? Because it didn't happen that way."

Defendant submits that the Assistant Circuit Attorney, by such remarks, urged the jury to infer guilt from defendant's silence prior to trial, in violation of defendant's Fifth Amendment right against self-incrimination.

Initially, we note that defendant failed to raise this point in his motion for new trial and did not object to the remarks in the closing argument. Thus, the point is not properly preserved for review. *State v. Grey*, 525 S.W.2d 367, 370 (Mo.App.1975). Defendant argues, however, that the comments constituted plain error and should be reviewed under Rule 27.20(c). We find no merit in defendant's complaint as to either remark. While the right to remain silent does attach to pretrial proceedings, *State v. Roth*, 549 S.W.2d 652, 654 (Mo.App.1977), that principle is not applicable to this case. Here, the defendant objected to the cross-examination question which the trial court sustained. Even if the trial court had not sustained the objection, there was no Fifth

Amendment violation warranting reversal under the plain error doctrine because the comment related to defendant's failure to offer evidence, not his failure to testify. *State v. Sechrest*, 485 S.W.2d 96, 98 (Mo. 1972); *State v. Pruitt*, 479 S.W.2d 785, 789–790 (Mo. banc 1972). The closing argument comment cannot possibly implicate the Fifth Amendment rights of the defendant because it is not even directed at the defendant. Rather, the comment attacks the credibility of one of the defendant's witnesses, Mr. Rieves. We rule this point contrary to defendant's contention.

Defendant's last claim of error which we treat arises out of the prosecutor's comment in closing argument on defendant's failure to call other customers of Mr. Rieves' tavern to bolster his alibi defense. During the course of argument, the prosecutor said:

> "Happy hour. A lot of regulars at the bar. This man has been at the bar for two years. All right, he stays there till closing time, . . . 1:30; he knows all the people in the bar, the regulars. Where are all the other people in the bar. Only one man came in out of forty-two people in that bar? Fourteen bar stools, and the place was jammed.
>
> Ladies and gentlemen, there have been twelve happy hours since this took place. Twelve times this man could have talked to people that were in the bar that night, and have people come in here and testify, and now he couldn't find anybody that would testify he was there from 9:00 to 10:00. This man said he was there already all night long."

Defendant now claims that the trial court erred in permitting such argument because there was no evidence that the witnesses were more available to him than to the state nor any indication that any of his fellow customers could have supported his testimony. This point has not been properly preserved for appellate review. Not only did the defendant fail to object to the closing argument, but he failed to raise this point in his motion for new trial. *State v. Grey*, 525 S.W.2d 367, 370 (Mo.App.1975). Nevertheless, we find no error in the court's

not taking action during the closing argument because said remarks were a permissible comment on appellant's failure to produce evidence. Indeed, the prosecutor's comments may be regarded as having been invited by the defendant's own testimony that he had "other people to say I was there" at Rieves' bar.

The community of interest among drinking companions has been held to make them more available to each other than to the state with respect to supplying or refuting alibi testimony. The failure of a defendant to call such a witness is a legitimate subject of comment for a prosecutor. *State v. Wilkerson*, 559 S.W.2d 228 (Mo.App.1977); *State v. Williams*, 532 S.W.2d 826, 830 (Mo.App.1975). In the instant case, the trial court committed no error in failing to intervene *sua sponte* in the closing argument presented on behalf of the state.

For the reason stated at the outset, the case is reversed and remanded for a new trial.

KELLY and STEWART, JJ., concur.