**Jerry JENNINGS, Movant-Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 12274.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 15, 1982.

Cody A. Hanna, Buffalo, for movant-appellant.

John Ashcroft, Atty. Gen., Priscilla Gunn, Asst. Atty. Gen., Jefferson City, for respondent.

MAUS, Chief Judge.

The movant was charged with capital murder (then first degree murder) for the shotgun slaying of Joe Woodruff on March 25, 1974. A jury found him guilty of murder in the second degree. As a habitual criminal, the court sentenced him to life imprisonment. Upon appeal to this court, his conviction was affirmed. *State v. Jennings*, 555 S.W.2d 366 (Mo.App.1977). In this case he seeks to have his sentence set aside by his motion filed under Rule 27.26. After an evidentiary hearing, the trial court denied that motion. On appeal, the movant presents four points by which he contends the trial court erred in denying his motion.

His first point is that he was sentenced by a court "without jurisdiction to try the case". That point is asserted with the following factual background. A complaint was filed in the magistrate court of Laclede County. A preliminary hearing was held and the movant was bound over to answer a felony charge in the circuit court of Laclede County. The movant then filed in that circuit court his application for a change of venue from the 26th judicial circuit. This application was sustained and the case removed to the circuit court of Dallas County. Thereafter, an information was filed in the circuit court of Dallas County. The information, following the language of the complaint, did not include an allegation the movant acted "deliberately". The day the information was filed, the prosecuting at-

torney sought leave to amend that information by adding an allegation that the movant did kill Joe Woodruff "deliberately". The movant withdrew his objection to that amendment and expressly waived his right to a preliminary hearing upon the amended charge. The movant was arraigned upon the amended information and entered a plea of not guilty.

■ It is expressly provided that a prisoner in custody seeking relief on the ground that his sentence was imposed by a court "without jurisdiction to do so" may file a motion to set aside that sentence. Rule 27.26. However, such an attack under Rule 27.26 is a collateral attack. *State ex rel. Reece v. Campbell*, 551 S.W.2d 292 (Mo.App. 1977). The absence of jurisdiction referred to must be such as to cause the sentence to be void. *Wilhite v. State*, 614 S.W.2d 33 (Mo.App.1981). It is not a lack of jurisdiction to proceed that could have been raised by timely objection but otherwise may be waived. *Lee' v. State*, 591 S.W.2d 151 (Mo. App.1979).

■ The term "jurisdiction" may bear one of several different meanings. It may be used with the connotation of jurisdiction over the subject matter. *State v. Mitchell*, 229 Mo. 683, 129 S.W. 917 (1910). Or, it may be used in the sense of the power to render the particular judgment in question. *State v. Nolan*, 418 S.W.2d 51 (Mo.1967). Or, in the sense of venue. *State v. Wood*, 596 S.W.2d 394 (Mo. banc 1980). Or, the term may refer to jurisdiction of the person. *State v. Mitchell*, supra. The movant argues the circuit court of Laclede County did not acquire "jurisdiction of the case" because no information was filed in that court. Therefore, he reasons, that circuit court had no power to remove the case to the circuit court of Dallas County. Then, he concludes the circuit court of Dallas County had no jurisdiction to try the case or to impose the sentence. To support this argument he cites cases saying that a felony case is instituted by indictment or information filed in the circuit court, such as *State v. Hasler*, 449 S.W.2d 881 (Mo.App. 1969). He does not reconcile cases saying

the filing of a complaint in the magistrate court was the first step in instituting a criminal charge. *State v. Rhodes*, 591 S.W.2d 174 (Mo.App.1979). This proposition is now set forth in the criminal rules. Rule 22.01 effective January 1, 1980. Nor, does he controvert cases holding "[t]he jurisdiction of the subject matter was vested in the magistrate court when the charge was filed, and the jurisdiction of Standefer's person was obtained when he was arrested and put in jail". *State ex rel. Standefer v. England*, 328 S.W.2d 732, 735 (Mo.App.1959). Also see *State ex rel. Lamar v. Impey*, 365 Mo. 437, 283 S.W.2d 480 (banc 1955). For the reasons hereafter stated, it is not necessary to determine whether or not granting movant's application for a change of venue before an information was filed was an irregularity or a deviation from prescribed procedure.

To support his conclusion, movant cites other cases which he asserts show the circuit court of Dallas County had no jurisdiction and that such lack of jurisdiction could not be waived. However, these cases deal with a court that had no jurisdiction over the subject matter, e.g. *State v. Ferguson*, 278 Mo. 119, 212 S.W. 339 (banc 1919). Or, they deal with the lack of power of a circuit court to render a particular judgment because no information had been filed e.g., *Montgomery v. State*, 454 S.W.2d 571 (Mo. 1970). Or, because the information did not charge the crime of which the defendant was convicted e.g., *State v. Brooks*, 507 S.W.2d 375 (Mo.1974); *State v. Nolan*, supra.

■ There is no doubt the circuit court of Dallas County, as well as the circuit court of Laclede County, had jurisdiction of the subject matter. *State v. Mitchell*, supra. The movant does not question the fact the amended information charged the crime of capital murder. It is clearly established the movant could waive a preliminary hearing upon the amended charge, *State v. Wood*, supra; *State v. McKinley*, 341 Mo. 1186, 111 S.W.2d 115 (1937); *State v. Cooper*, 344 S.W.2d 72 (Mo.1961), if such was necessary. *State ex rel. Thomas v. Crouch*,

603 S.W.2d 532 (Mo. banc 1980). From the record it is clear that he did so. It is equally clearly established that the movant could waive jurisdiction in the sense of venue. *State v. Wood,* supra; *Hogshooter v. State,* 585 S.W.2d 175 (Mo.App.1979). From the record it is clear that he did so. It is also clear the circuit court of Dallas County acquired jurisdiction of his person. *State v. Conway,* 351 Mo. 126, 171 S.W.2d 677 (1943).

■ In summary, the movant's sentence resulted from a trial upon an information that properly charged him with capital murder and in a circuit court that had jurisdiction of the subject matter and of his person. If there was an irregularity concerning venue, that irregularity was waived. "Having made his election, and the court having awarded him a change of venue at his own request, he cannot now complain of the privilege granted him." *State v. Taylor,* 132 Mo. 282, 287, 33 S.W. 1145, 1147 (1896). Also see *State v. Hampton,* 172 S.W.2d 1 (Mo.1943). The movant's first point is denied.

■ The movant's next three points, each assigning a different reason, assert he was denied the effective assistance of counsel. Counsel is ineffective if he does not render "that degree of performance which conforms to the care and skill of a reasonably competent lawyer rendering similar services under the existing circumstances". *Reynolds v. Mabry,* 574 F.2d 978, 979 (8th Cir. 1978), adopted in *Seales v. State,* 580 S.W.2d 733 (Mo. banc 1979). The movant has the burden of proving a breach of that standard and that he was prejudiced thereby. *Rodgers v. State,* 610 S.W.2d 25 (Mo. App.1980); *Covington v. State,* 600 S.W.2d 186 (Mo.App.1980). These three points require a statement of the evidence.

Rita Gail Griffin was an 18-year-old dispatcher for a cab company in Lebanon. Joe Woodruff had been a driver for the cab company, but had been terminated. It is not clear that he had been re-employed at the time of his death. Griffin and Woodruff had "gone together" for two or three months and he had lived with her for one

and one-half days before his death. Linda Yaeger was Woodruff's ex-wife who lived in Lebanon. The cab stand was located in the bus station. Griffin and Yeager testified to the following facts. At approximately 7:30 to 8:00 p. m. on March 25, 1974, the movant and Larry Eldon Young came to the bus station in a blue Ford. Griffin and Woodruff were there. Griffin heard parts of a conversation between Woodruff and movant. Initially, the movant threatened Woodruff saying, "I am here to pick you up" and "I am here to get your ass". Then the conversation took on a more friendly tone. Woodruff made a phone call. A friend of his soon arrived and joined the conversation. Later, the movant and Young left.

Linda Yaeger, in response to a phone call from Woodruff, then arrived at the bus station. She and Woodruff talked "a lot". During the conversation, Woodruff said, "someone was out to kill him, Jerry from Conway". When movant and Young returned, Woodruff again talked with them. They left and Woodruff followed driving a blue Pontiac he borrowed from Yaeger. When Woodruff did not return as expected, Yaeger drove toward the place she had been told Woodruff was to meet the movant. She met her Pontiac closely followed by the blue Ford. She could not see who was driving the vehicles, but assumed everything was all right and returned to the bus station. Woodruff did not return.

The testimony of various law enforcement officers established the following facts. At approximately 1:30 a. m. on the night in question, an officer on patrol saw a pool of blood on a low-water bridge over a stream in southeast Laclede County. There was a shotgun pellet in the pool of blood. After driving a short distance, the officer found the Yaeger Pontiac parked and locked on a side road between the bridge and Lebanon. There were extensive blood stains in the rear seat of the Pontiac and blood had flowed under the rear seat cushion to the floor board. There, blood had accumulated and there was a hole from which it dripped to the ground. On this

fateful night, an officer was on radar duty on a highway that could have been traveled in going from a gravel pit to the low-water bridge. Between 10:30 p. m. and midnight, this officer saw the Pontiac and Ford passing in a direction that would have been taken toward the bridge. The following morning, the body of Woodruff was found below the low-water bridge. He had been shot in the face by a shotgun. A plastic cup of the type used in a 12-gauge shotgun shell was removed from Woodruff's throat. An investigation at the gravel pit revealed a pool of dried blood, a blood stained tire track, and a trail of blood consistent with having dripped from the hole in the floor board of the Pontiac. Tests demonstrated that the blood found on the bridge, in the Pontiac, at the gravel pit and Woodruff's blood were of the same type. When arrested, the movant was wearing boots, one of which matched a print in the mud at the side of the road adjacent to the Pontiac.

At the time of the murder, the movant was living with his mother and step-father at or near Conway. Appearing under subpoena and threat of a writ of attachment, the movant's mother tearfully testified that on the night in question at about 10:00 p. m. she saw a car come into her driveway and assumed it was the movant. After the door had been unlocked, and she had returned to her bed, the mother heard someone enter another bedroom and then leave the house. A 12-gauge shotgun was kept in a closet in the other bedroom. She got up from bed and went into that bedroom and "the door was open and there was shells—(Witness weeps)" and the 12-gauge shotgun which she had seen as late as 4:00 that afternoon was gone.

The state also presented the testimony of Larry Eldon Young. Young was separately charged with the murder of Woodruff. As the result of an agreement with the prosecuting attorney for a reduced charge and probation, Young appeared as a witness for the state in the trial of movant. In general, Young confirmed the visits to the bus station and a trip to the movant's home where the movant got the shotgun. He stated that the movant dealt in drugs and thought Woodruff was a narcotic agent. Jennings said he was going to kill him. He related how they met Woodruff at the gravel pit, the movant ordered Woodruff into the back seat of the Pontiac and movant shot him. He said he then drove the Ford, following the Pontiac driven by movant, to the low-water bridge where the movant threw Woodruff into the river. Young denied any personal involvement in the shooting or disposition of the body.

The movant elected to testify. He denied killing Woodruff. He stated he spent the evening and night with Young riding around, drinking beer and visiting with friends, including friends at the Webb Trailer Court. He stated he did stop by the bus station to use the phone. He casually visited with Woodruff. He insisted that his mother was mistaken in her testimony about the shotgun. He stated that he did not drive his brother-in-law's blue Ford on Highway 32 the night in question and that the highway patrolman, Yaeger and Young were mistaken in saying that it was driven on Highway 32.

The transcript of the preliminary hearing as well as the transcript of the trial is a part of the record in this proceeding. While the same was not introduced in evidence, the testimony of Andre Ramon Tunstall at the preliminary hearing must be noted. It appears Tunstall may have been unavailable for the trial so that his testimony at the preliminary hearing might have been admissible ° if offered by the state. *State v. Johnson*, 618 S.W.2d 191 (Mo.1981). In all events, his testimony is pertinent, insofar as it may have a bearing upon what the movant's trial counsel did and did not do. Movant had lived with Tunstall in the Webb Trailer Court at one time. Tunstall related that late the night of the murder, movant and Young came to his mobile home. They drank beer and talked and rode around. During the conversation, movant said he needed Tunstall for an alibi, "because there was some dudes that had a score to settle with Joe". Either movant or

Young said the river was cold and wet. When asked if movant said anything about Joe Woodruff, Tunstall replied, "Yeah. He just said that we wouldn't have to worry about Joe anymore and—". When asked what Larry Young would do when movant made such a statement, he replied, "We would all just start laughing more or less".

Movant first claims his trial counsel was ineffective because he did not subpoena witnesses necessary to cause a report of neutron activation analysis tests to be admissible. See *State v. Toney*, 537 S.W.2d 586 (Mo.App.1976). Soon after their arrest, the morning after the murder, appropriate swabs were taken from the hands of movant and Young. Apparently, neutron activation analysis tests were performed with the use of these swabs to determine the presence of gunpowder residue upon the hands of movant and Young. A letter to the highway patrolman investigating the case purported to set forth the results of these tests. The author of the letter concluded the results in reference to the palms of movant were indicative of movant having recently handled a firearm. However, he continued, the results concerning the backs of movant's hands were too low for him to make a definite determination as to whether or not he had recently discharged a firearm. The author concluded that the results in reference to Young were indicative of the fact that he had recently handled and discharged a firearm.

■ As a part of movant's case, his counsel attempted to introduce this letter through the highway patrolman to whom it was addressed as a business record. Movant argues that if this letter had been placed in evidence, it would have conclusively proved Young lied about not having handled the shotgun, impeached all of his testimony and resulted in movant's acquittal. In presenting this point, the movant does not take into account all of the contents of the letter nor all of the testimony in the case. The letter not only contains the conclusions referred to, but figures indicating the results of the tests as follows:

Jerry Jennings

| Sample | µg Ba | µg Sb |
|---|---|---|
| blank | .0010 | .0010 |
| left hand back | .193 | .0129 |
| right hand back | .238 | .0065 |
| left hand palm | .402 | .0247 |
| right hand palm | .386 | .0200 |

Larry Young

| Sample | µg Ba | µg Sb |
|---|---|---|
| blank | .0010 | .0010 |
| left hand back | .268 | .0164 |
| right hand back | .313 | .0154 |
| left hand palm | .373 | .0356 |
| right hand palm | .307 | .0174 |

Further, Young testified that during the night he threw some shotgun shells from the car and at the time movant fired the shotgun, the movant was wearing his socks as gloves. Movant has not demonstrated how the expert's opinion would have been altered had the expert known Young had handled shotgun shells or that movant had, as indicated, worn socks as gloves. Had the witnesses movant referred to been subpoenaed, their opinions could have corroborated Young's testimony.

In all events, both the figures and the expressed opinion of the expert establish the movant had, in direct contradiction to his testimony, recently handled a firearm. This would corroborate the testimony of Young and movant's mother that movant did get his shotgun. At the time of this murder, one could be found guilty as a principal by aiding and abetting another. *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982). For all of these reasons, the movant has not demonstrated that he was prejudiced by his counsel's failure to subpoena the witnesses referred to in this point.

■ Still further, movant's trial counsel could not have been ineffective in not subpoenaing the witnesses referred to unless they were in fact available for subpoena and their testimony would have been consistent with the letter and otherwise admissible. The movant in this proceeding presented no evidence to demonstrate that any of these things were in fact true. Compare *Shepherd v. State*, 529 S.W.2d 943 (Mo.App.1975). The point is denied.

■ The movant also claims trial counsel was ineffective by not objecting to the coer-

cion to which the jury was subjected by the late hours of deliberation and comments of the trial judge. This point is premised upon the movant's conclusion it would have been error for the trial court to overrule such an objection. At 7:55 p. m. the case was submitted to the jury. At 9:55 p. m., upon learning the jury stood 8 to 4, but not how, the trial court asked the jury to deliberate some more. At 11:05 p. m. when the jury stood 10 to 2, the trial court gave the jury MAI–CR 1.10. One juror doubted her ability to continue. Upon inquiry, the jury was divided upon the issue of whether or not the jury wanted to continue deliberations that night. The court then advised the jury arrangements had not yet been made for their overnight accommodations and asked the jury to continue deliberations until such arrangements could be made. It is at this point movant contends the trial court would have erred if it had not sustained an objection to continued deliberations. Movant argues this is so because the trial was held in a small town with limited facilities and it was the height of the tourist season. He concludes there was no possibility of obtaining accommodations and implies the jury reached a verdict only for an opportunity to rest. Movant's conclusion is not based upon any evidence. It is sheer speculation and for that reason the point must be denied.

Further, the record shows that after the last mentioned remark by the court, a member of the jury, without objection or comment from anyone, asked permission for the jury to deliberate until midnight. The court granted this permission. At 11:53 p. m. a verdict was returned. To support this point the movant cites *State v. Mason*, 588 S.W.2d 731 (Mo.App.1979) and *State v. Haddix*, 566 S.W.2d 266 (Mo.App.1978). *Haddix* is far from being authority on this point. *Mason* is to be distinguished in that in this case the court did not impose a time limit on the jury, rather the jury asked permission to continue deliberations. "The tone of the dialogue in the present case does not convey a sense of pressure being put on the jury." *State v. Haymon*, 616 S.W.2d 805, 809 (Mo. banc 1981). The conclusion of the 27.26 trial court that the

original trial court did not abuse its discretion concerning the time and length of the jury's deliberations is supported by the evidence and the law. *State v. Haymon*, supra; *State v. Crawley*, 478 S.W.2d 344 (Mo. 1972); *State v. Garrett*, 595 S.W.2d 422 (Mo.App.1980). The point is denied.

■ Movant's final point is that "the sum total of defense counsel's actions, omissions, and conduct during the course of this trial show that Defense Counsel was not competent at that point in time to represent Movant, thus denying Movant-Appellant effective assistance of counsel ...". To support this conclusion, which falls far short of a properly stated point of error, movant first cites the testimony of appointed trial counsel's fired secretary. It must be noted appointed trial counsel was dead when movant's motion was filed. This witness eagerly testified adversely concerning such counsel's personal habits and lack of orderliness in his office affairs. While this experienced legal secretary was present during movant's trial, she did not allude to any manner in which her employer did not give the movant effective assistance.

The movant next refers to his motion which he says sets out twenty-five points of incompetence. He then urges the court to read the transcripts of conferences between the movant and his appointed trial counsel and of the preliminary hearing and the trial. He asserts this court will then be convinced the movant was denied the effective assistance of counsel. By further considering this point, this court does not condone such a conclusionary argument. In spite of such deficiencies, this court has carefully considered this point and read and considered the legal file and all of those transcripts.

First, it must be observed that in his motion the movant does not confine his allegations of ineffectiveness to his appointed trial counsel, but includes his retained trial counsel and appointed counsel on appeal. Without further lengthening this long opinion, it is sufficient to find, as did the trial court, that such allegations of inef-

fectiveness are abstract propositions that do not demonstrate how movant was prejudiced, are related to trial tactics, are refuted by the record or otherwise do not state a basis for relief under Rule 27.26. *Kretzer v. State,* 612 S.W.2d 70 (Mo.App.1981). This is demonstrated by his complaint concerning trial counsel's advice upon whether or not he should testify. The transcript of a conference shows such counsel fully advised movant of the pros and cons and left the decision to movant. This was not ineffective assistance. *Walker v. State,* 567 S.W.2d 398 (Mo.App.1978).

No doubt movant's trial counsel did not conduct the defense in the same manner or speak the same words as would his present counsel. The manner of defense might seem inappropriate before a jury from a metropolitan area. However, appointed trial counsel was experienced in the trial of cases in the Dallas County area. The testimony at the trial has been recounted at length to demonstrate the evidence of movant's guilt was strong. The conference transcripts, which movant testified he desired to be made and which he introduced in evidence, reflect that in spite of repeated entreaties to do so, the movant was unable to suggest any source of evidence favorable to him. The trial transcript shows appointed trial counsel dealt with that adverse evidence with resourcefulness and skill. Movant was found guilty of second degree murder instead of first degree murder. The finding of the trial court that the movant did not demonstrate his counsel was ineffective is supported by the evidence. Movant's last point is denied. The movant had a fair trial and the judgment is affirmed.

PREWITT, P. J., and HOGAN and BILLINGS, JJ., concur.