23CA0005 Peo v Czeponis 11-14-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0005
Boulder County District Court No. 19CR2137
Honorable Nancy W. Salomone, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Michael David Czeponis,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE JOHNSON
Fox and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Lauretta A. Martin Neff, Alternate Defense Counsel, Montrose, Colorado, for
Defendant-Appellant

¶ 1     Defendant, Michael David Czeponis (Czeponis), appeals the judgment of conviction entered on jury verdicts finding him guilty of five counts of sexual assault on a child and one count each of criminal mischief, assault, cruelty to animals, and harassment.

¶ 2     He contends that the district court erred by (1) giving a time-fused deliberation instruction and making a mid-deliberation juror replacement, depriving him of a fair trial; and (2) allowing the jury to rewatch A.S.'s forensic interview during deliberations.  We disagree with his contentions and therefore affirm.

## I.     Background

¶ 3     Czeponis and his five children, A.S., E.S., K.C., S.C., and M.C., lived in an apartment.  Due to housing instability, Czeponis' friends and their three children, T.L., S.L., and A.L., later moved in with Czeponis and his children.  Czeponis spent a lot of time with the children, as well as K.L., who was a friend of the children.

¶ 4     One day, Czeponis and his oldest daughter, A.S., got into an argument over A.S.'s relationship with her partner.  Czeponis lost his temper and punched A.S. giving her a bloody nose and black eye.  During the same incident, Czeponis also injured his friends' dog; poured alcohol on E.S.'s bed; kicked E.S.; and sent threatening

1

text messages to R.E., A.S.'s partner. Czeponis then got drunk and added graffiti to a skate park with angry language targeting his children.

¶ 5 A few days after this incident, the friends' child T.L. disclosed to family and social workers that Czeponis had been sexually assaulting her. T.L. stated in a forensic interview that, on several instances, Czeponis had touched her breasts and vagina. And on at least one occasion, T.L. woke up naked, and Czeponis was touching her breasts and vagina with his hands and mouth and then rubbed his penis against the outside of T.L.'s vagina. Following this interview, all the children were removed from Czeponis' home.

¶ 6 Five days later, A.S. recounted the events that led to Czeponis punching her. In addition to the physical assault, A.S. disclosed that Czeponis had inappropriately touched her and that he would cuddle with her while he was completely naked. Ten months after A.S.'s interview, S.L. came forward and accused Czeponis of inappropriately touching her. S.L. stated that Czeponis touched her breasts over her bra on several occasions.

¶ 7 About six months after S.L.'s disclosure, K.L., the friend of Czeponis' children, stated in a forensic interview that on two

2

separate occasions Czeponis pushed her up against a wall and then ran his hand up under her shirt and touched her bra.

¶ 8     Czeponis was charged with five counts of sexual assault on a child — two counts of sexual assault on a child by one in a position of trust – pattern of abuse (T.L. and A.S.); two counts of sexual assault on a child by one in a position of trust – victim less than fifteen and as part of a pattern of abuse (S.L. and K.L.); and sexual assault on a child – pattern of abuse (T.L.) — two counts of third degree assault (A.S. (punch) and A.S. (choke)); child abuse (S.L.); two counts of harassment (S.L. and E.S.); criminal mischief; cruelty to animals; and violation of a protection order.

¶ 9     Czeponis did not testify at trial but defended on theories that there was no corroborating evidence, and the children were motivated to get out of a bad living situation.  A jury convicted Czeponis on all charges but acquitted him of third degree assault (A.S. (choke)) and child abuse (S.L.).[1]  He was sentenced to sixty-six years to life in the custody of the Department of Corrections.

---

[1] The harassment and violation of a protection order charges were severed and dismissed after Czeponis' conviction.

## II.    Time-Fused Deliberation and Alternate Juror

¶ 10    Czeponis contends that the district court misspoke and gave the jury a time-fuse instruction depriving him of a fair trial.  He also contends that the court's error was further exacerbated when the jury had to begin deliberations anew with an alternate juror.  We disagree.

### A.    Additional Facts

¶ 11    After the first day of deliberations, the district court told the jury, "[The bailiff] has been in communication with the alternate jurors and they remain available as alternates, but *it remains most efficient if you are able to complete the deliberations tomorrow.*"  (Emphasis added.)  The next morning, outside of the presence of the jury, defense counsel asked the court, "When we were breaking last night with the jurors, I might have misheard, but I thought I heard the Court say something about it would be most efficient if you could complete your deliberations tomorrow, meaning today."  The district court interrupted and stated, "I hope you did.  The Court said, of course, we have the alternates available, but it would be most efficient if the [jury] would be able to return tomorrow to complete [its] deliberation."  Defense counsel replied, "That's

4

probably what you said.  And I, in my sleep deprived state, heard it wrong."  Czeponis did not seek any further inquiry or relief.

¶ 12    The district court and the parties then continued their conversation about the need to replace a juror who was unavailable to continue deliberations due to an emergency.  The district court brought in the eleven remaining members of the jury, explained that one of the previous jurors was unable to continue deliberations, and inquired whether the jurors would be able to "incorporate a new juror into [the] deliberations and begin anew."  The district court gave the jurors an opportunity to meet and discuss this development in private.

¶ 13    The jury returned; the court confirmed with each member of the jury that they could begin deliberations anew by setting aside any prior discussions.  The district court then conducted a detailed inquiry into the alternate juror before adding her to the jury, ensuring that the juror heeded the court's instructions even though she was not a member of the original twelve jurors.  The court provided the jury with new verdict forms, at the jury's request, and the alternate juror joined the deliberations.

## B. Preservation and Standard of Review

¶ 14 The Attorney General argues that Czeponis waived the time-fused instruction issue. We conclude that Czeponis forfeited it.

¶ 15 The purpose of an objection is to afford the district court "an opportunity to focus on the issue and hopefully avoid the error." *Forgette v. People*, 2023 CO 4, ¶ 22 (quoting *Martinez v. People*, 244 P.3d 135, 139 (Colo. 2010)). "[M]erely calling an issue or fact to the court's attention, without asking for any relief, is insufficient to preserve an issue for review." *Id.* at ¶ 23. But here, the court's response to defense counsel implies its recognition that if it had given the jury a time limitation, such would have been improper. This position is reflected when the court said that it "hope[d]" that defense counsel misheard the court's statement. But even though defense counsel brought this issue to the court's attention, there was no further inquiry or relief sought. In this situation, we conclude that this issue is, at most, forfeited.

¶ 16 Forfeiture is "the failure to make the timely assertion of a right" and generally occurs through neglect. *Id.* at ¶ 29; *People v. Rediger*, 2018 CO 32, ¶¶ 41-44 (acquiescence is forfeiture, not

6

waiver).  Unlike waiver, forfeiture does not extinguish appellate review, and therefore, we review for plain error.  *Forgette*, ¶ 30.

¶ 17    Plain error is error that is both "obvious and substantial" and that "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction."  *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005) (quoting *People v. Sepulveda*, 65 P.3d 1002, 1006 (Colo. 2003)).

¶ 18    "[W]ith respect to jury instructions, reversal under a plain error standard requires a defendant to 'demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his [or her] conviction.'"  *People v. Garcia*, 28 P.3d 340, 344 (Colo. 2001) (quoting *Bogdanov v. People*, 941 P.2d 247, 255-56 (Colo. 1997)). "[A]n erroneous jury instruction does not normally constitute plain error where the issue is not contested at trial or where the record contains overwhelming evidence of the defendant's guilt."  *Miller*, 113 P.3d at 750.

¶ 19    Czeponis preserved his argument that the district court's time-fuse instruction deprived him of a fair trial.

## C.    Time-Fuse Jury Instruction

¶ 20    Defense counsel was correct that the court misspoke because the court's instruction suggested that the jury must complete deliberations by the end of the next day.  Although we agree with Czeponis that the district court's jury instruction was erroneous, we conclude it is not reversible error.

¶ 21    It is the district court's duty to instruct the jury on all matters of law.  *Garcia,* 28 P.3d at 343.  "We review de novo whether a particular jury instruction correctly states the law."  *People v. Nerud,* 2015 COA 27, ¶ 35.

¶ 22    There is no per se ban on "time-fuse" jury instructions in Colorado.  *Cf. Goff v. United States,* 446 F.2d 623 (10th Cir. 1971); *Burroughs v. United States,* 365 F.2d 431 (10th Cir. 1966).  Rather, our supreme court has chosen a "case-by-case examination of the particular facts of each case where the instruction is given" to determine whether the time-fuse instruction has a coercive effect. *Allen v. People,* 660 P.2d 896, 899 (Colo. 1983).

¶ 23    For four reasons, we are not convinced the erroneous instruction constituted plain error.

¶ 24 First, the district court made its incorrect statement while referencing the potential need for alternate jurors and how it would remain most efficient if the original jurors were able to complete deliberations without substitutions. And the court's statement did not stress the time deadline or threaten a mistrial. *See People v. Fell*, 832 P.2d 1015, 1020 (Colo. App. 1991); *Goff*, 446 F.2d at 626. Nor did the court say that the jury *had to* meet the purported deadline, only that it would be "most efficient" if it did so.

¶ 25 Second, the jury heard the district court read through the formal instructions and received copies of the same. The formal instructions had no mention of any deadline. *Johnson v. People*, 2019 CO 17, ¶ 16 ("[W]e must presume that the jury followed all of the court's instructions."); *Smit v. Anderson*, 72 P.3d 369, 375 (Colo. App. 2002) (Absent a contrary showing, jurors are "presumed to have understood and heeded the trial court's instructions."). Indeed, the alternate juror was instructed in the presence of the other jurors to begin deliberations anew, the venire confirmed they could conduct deliberations anew, and the court provided the jury with new verdict forms.

¶ 26　　Third, time-fuse instructions generally have a "coercive effect" when the court orders deliberations to be completed within a short time period.  *See Allen*, 660 P.2d at 898 (a fifteen-minute deadline to reach a verdict before the court would declare a mistrial may have prevented the jury from reaching a well-considered verdict); *People v. Hill*, 355 N.Y.S.2d 612, 612 (App. Div. 1974) (per curium) (a ten-minute deadline was coercive considering the court's threat that jurors would be sequestered overnight if they did not reach a verdict); *State v. Mason*, 588 S.W.2d 731, 734-35 (Mo. Ct. App. 1979) (a fifteen-minute deadline was coercive).  In this case, there was an entire day of deliberations between the erroneous instruction and the verdict.

¶ 27　　But even if we were to consider the district court's statement about the alternates out of context, the parties have not cited, nor are we aware of, any Colorado case law finding a "time-fuse" instruction to be coercive when the jury was provided a full day to deliberate.  Our conclusion is bolstered by two other considerations on this point.  There was no evidence that the jury was then deadlocked and that this erroneous instruction caused them to reach a verdict.  *Cf. Gibbons*, ¶ 35; *People v. Lazdins*, 728 P.2d 354,

355-56 (Colo. App. 1986). And the jury returned a split verdict indicating that they considered the evidence and that the error did not contribute to the verdict. *See Martin v. People*, 738 P.2d 789, 795-96 (Colo. 1987).

¶ 28     Fourth and finally, there was substantial evidence supporting the verdict. There were four outcry witnesses who made claims against Czeponis. Three of the outcry witnesses came forward after they were already out of Czeponis' house and no longer living with or relying on him for care. And the prosecution presented text message screenshots between S.L. and Czeponis demonstrating Czeponis' manipulative and inappropriate tendencies.

¶ 29     The victim outcries and statements reflect age-appropriate descriptions of the assaults. *See Pierson v. People*, 2012 CO 47, ¶ 19 ("[T]he sexual knowledge displayed by the child-victim in this case involved little more than a basic awareness of male sexual anatomy and an awareness that applying pressure to her own external genitalia could be painful."). T.L. stated Czeponis was rubbing her "lower area," and she was "scared and confused." T.L. was "visibly upset, sniffling and appeared to be wiping away tears" during her forensic interview.

¶ 30 In fact, all victims appeared shaken and scared when giving their forensic interviews. K.L. stated that Czeponis "pushed [me] up against the wall and hurt me; sexually assaulted me, I guess." She continued, he "held me there and touched me in places where a grown man shouldn't touch a little girl." She stated, "[H]e touched my top area." S.L. stated that Czeponis forced her to cuddle with him, and he would "run his hand up and down her leg and side and chest area." S.L. also said that Czeponis, while cuddling with her, made her put her hand "really close" to his penis.

¶ 31 Accordingly, we discern no reversible error.

### D. Alternate Juror

¶ 32 Czeponis argues that the incorporation of an alternate juror the next morning "exacerbate[d] this time pressure," and he suggests that the cumulative impact of the "mistaken time-fuse" and "mid-deliberation juror substitution" deprived him of a fair trial. We disagree.

¶ 33 In *Castro v. People*, 2024 CO 56, ¶ 75, our supreme court reaffirmed its case law holding that, while a mid-deliberation replacement of a juror raises a presumption of prejudice to the defendant's right to a fair trial, the presumption may be rebutted if

the district court follows the procedures in *People v. Burnette*, 775 P.2d 583, 588 (Colo. 1989). *See also Carrillo v. People*, 974 P.2d 478, 490 (Colo. 1999). *Burnette* identified specific concerns that, because of a mid-deliberation substitution, the substitute juror

- may not have a realistic opportunity to express her views and to persuade others;
- will not have been part of the dynamics of the prior deliberations, including the interplay of influences among and between jurors, that advanced the other jurors along their paths to a decision;
- will not have the benefit of the unavailable juror's views; and
- may be thrust into service due to a lone juror who cannot in good conscience vote for conviction and feigns illness in order to place the burden of decision on an alternate.

*Burnette*, 775 P.2d at 588. To overcome the presumption of prejudice, *Burnette* indicates a court should take "extraordinary precautions" such as

13

- instructing the alternate that she is not discharged, must continue to follow the court's instructions, and must not form an opinion based on external information;

- questioning the alternate about her activities and information received after being released and whether he or she followed the court's instructions;

- instructing the original jurors that they must put their previous deliberations out of their minds and begin deliberations anew;

-  asking the original jurors individually if they can put their prior deliberations out of their minds and start over; and

- asking the original jurors if they can be receptive to the alternate's attempt to assert a nonconforming view.

*See id.* at 590-91; *see also Carrillo*, 974 P.2d at 491-93.

¶ 34     Further, "an appellate court must be satisfied that 'under the circumstances of the case, the precautions were adequate to achieve that result.'" *Carrillo*, 974 P.2d at 493 (quoting *Burnette*, 775 P.2d at 590). *Castro*, ¶ 75, went through the precautions undertaken by the district court in that case and indicated the

14

procedure was a "model for trial courts" confronted with substitution of a juror mid-deliberation.

¶ 35    We conclude that any presumption of prejudice the alternate juror substitution caused was rebutted by the district court's precautions, which substantially included the procedures from *Castro* and *Burnette*.

¶ 36    It explained the situation clearly and gave the original jurors time to think about and discuss whether they would be able to properly include the alternate juror. The jury convened for about five to seven minutes. When the jury returned, the district court instructed the eleven jurors that they must incorporate and respect the alternate juror's opinions, that they must inform the alternate of any previous discussions, and that any partial verdicts reached "would need to be set aside, [and must incorporate] the new juror's opinions and positions, perspectives before finalizing any verdict." *See Johnson,* ¶ 16. The foreperson of the original jury stated that, after a private discussion with the jury panel, "we felt comfortable integrating the alternate juror." And the district court polled each of the original jurors to ensure that the foreperson's statement was accurate as to every juror.

¶ 37     The court also took all appropriate precautions with respect to the alternate juror.  Before seating the alternate, the court gave her specific instructions to follow the court's previous directives, to not form an opinion about the case, and to keep an open mind.  The district court ensured that the alternate juror "did not have any communication with anyone about the trial" and that the juror did "not research any issues concerning the trial."  The court confirmed that the alternate juror was not approached by anyone about the case, had not formed any opinions, and was not exposed to any information concerning the case.  And at the conclusion of evidence, the district court did not discharge the alternate jurors but advised them of their ongoing responsibilities, although they would not begin deliberations with the twelve original jurors.

¶ 38     The court provided the jurors with new verdict forms, and the jurors, after the alternate was placed, posed a question to the court, indicating that the jurors started deliberations anew.  The jurors deliberated for nearly an entire day before reaching a split verdict.  This is even longer than in *Castro*, where that jury's deliberations of five and a half hours was noted by the supreme court to be "a

substantial amount of time to deliberate." *Castro*, ¶ 80.[2] And there was no evidence presented that the dismissed juror was a lone holdout for acquittal.

¶ 39 Because the district court painstakingly followed the procedures outlined in *Burnette* and *Carrillo*, and because the specific circumstances of this case do not demonstrate that Czeponis was prejudiced, we conclude that the district court's substitution of an alternate juror did not deprive him of a fair trial.

### III. A.S.'s Forensic Interview

¶ 40 Czeponis contends that the district court failed to fulfill its responsibility to guard against unfair or prejudicial use of A.S.'s forensic interview during jury deliberations prejudicing Czeponis. We disagree.

---

[2] We acknowledge that, unlike in *Castro v. People*, 2024 CO 56, ¶ 77, the court in this case did not take any notes the jurors may have had in their possession from the first deliberation. But the district court substantially complied with the procedures from *Castro* and *People v. Burnette*, 775 P.2d 583, 590 (Colo. 1989), and given the amount of time they deliberated, the record does not indicate that the possession of any notes adversely affected the jury beginning deliberations anew.

## A. Additional Facts

¶ 41 After the court seated the alternate juror, the jury asked the court if it could review A.S.'s forensic interview. The district court noted its inclination was to say, "[Y]es" and that "[j]urors are referred to the information in the court's policy for electronic exhibits, reminded to not give special weight to this evidence, and asked to review jury instruction number 9 and instruction number 25." The prosecution agreed with the district court.

¶ 42 Czeponis objected, citing *DeBella v. People*, 233 P.3d 664 (Colo. 2010), and *People v. Jefferson*, 2017 CO 35. Czeponis argued that the video "operate[s] as the functional equivalent of unsworn testimony, unsworn and unconfronted," and that since the jury will not be able to rewatch the testimony provided in the court room, viewing the forensic interview again will have "undue weight." Czeponis argued that it would violate "his rights to cross-examination and confrontation, violat[ing] due process and a fair trial."

¶ 43 Although Czeponis maintained his objection, he stated that if the video was going to be shown to the jury, it should be "done in the courtroom with all of us present, and the court reading the

limiting instruction as opposed to anyone else." The prosecutor responded that A.S. testified in court, and Czeponis had the opportunity to cross-examine her but chose not to do so.

¶ 44 The district court concluded that the jury could view the video. The court reiterated the instructions it had already given to the jury and noted that the video included limiting instructions at three separate times. The court noted that A.S. was also present and available for cross-examination after she testified.

¶ 45 In response to the jury's questions, the district court responded, "Yes. Please: (1) refer to the letter addressing viewing of electronic exhibits; (2) do not give special weight to this evidence; and (3) review jury instructions #9 and #25." The jury then rewatched A.S.'s forensic interview in the courtroom, and the bailiff read the limiting instructions three times. In relation to the charges concerning only A.S., the jury found Czeponis guilty of sexual assault on a child by one in a position of trust and guilty of one count of third degree assault (punch) but not guilty of the other count of third degree assault (choking).

## B. Standard of Review and Applicable Law

¶ 46 "[C]ontrol over the use of exhibits during jury deliberations remains firmly within the discretion of the trial court." *DeBella*, 233 P.3d at 666; *Jefferson*, ¶¶ 25, 29.

¶ 47 "It is a long-standing principle of appellate review that an appellate court may not substitute its own judgment for that of the trial court where a matter is committed to the trial court's discretion." *Debella*, 233 P.3d at 666. Therefore, appellate courts will not disturb the district court's decision unless the decision "was manifestly arbitrary, unreasonable, or unfair" or if "it misapplie[d] the law." *Jefferson*, ¶ 25.

¶ 48 Not all abuses of discretion warrant reversal. *Debella*, 233 P.3d at 667. "Only those erroneous rulings that 'substantially influenced the verdict or affected the fairness of the trial' should be upset." *Id.* (quoting *People v. Welsh*, 80 P.3d 296, 310 (Colo. 2003)). "However, if the influence of the error on the trial is apparent, or if one is left 'in grave doubt' as to its effect on the verdict or the fairness of the trial proceedings, the conviction cannot stand." *Id.* (quoting *Welsh*, 80 P.3d at 310).

## C. Analysis

¶ 49    In *Debella*, our supreme court held that a district court failed to ensure that evidence given to a jury with unfettered access during deliberations would not be given undue weight or emphasis because it "did not (1) give a limiting instruction with respect to the victim's videotaped statement; (2) wait for a jury request to review the videotape; or (3) obtain counsel's agreement to allow the jury to have access to the tape." 233 P.3d at 668 (quoting *People v. DeBella*, 219 P.3d 390, 404 (Colo. App. 2009) (Daily, J., dissenting)).

¶ 50    In this case, however, the district court appropriately exercised its discretion by limiting the jury's access to A.S.'s forensic interview. The district court waited for the jury to request a review of a videotape. *See Jefferson*, ¶ 56 (citing *Frasco v. People*, 165 P.3d 701, 702 (Colo. 2007)). After hearing Czeponis' objections to the rewatching of the interview, the district court, in responding affirmatively to the jury's request, specifically instructed the jury to "not give special weight to this evidence." *See id.* at¶ 19; *see Smit*, 72 P.3d at 375.

21

¶ 51    In addition to the "weight" instruction, the district court instructed the jury to "review jury instructions #9 and #25." Jury instruction #9 stated, "You are again instructed that you cannot consider that evidence except for the limited purpose I told you about when it was admitted." Jury instruction #25 identified the evidence of out-of-court statements made by A.S. and instructed the jury that it is its duty to "determine the weight and credit to be given any such statements." It further instructed the jury that it should "consider the age and maturity of the child, the nature of the statements, the circumstances under which the statements were made, and any other evidence that has been admitted that you choose to consider for this purpose."

¶ 52    The district court had also established rules controlling how the jury was able to view the interview, which it reiterated in its response to the jury's request. The district court required the exhibit to be "played or viewed once . . . in its entirety." The district court also prohibited "slow mode or fast forwarding" and instructed the jury to "not deliberate in front of the bailiff." *See Jefferson,* ¶ 57 (district courts have discretion to "craft alternative mitigation

22

procedures." (citing *DeBella*, 233 P.3d at 669)). The jury watched the video in the courtroom in the presence of the bailiff.

¶ 53 In this case, the district court exercised control over the jury's access to the videotape and "observe[d] caution" that the jury was not giving undue weight to the video, and the video was one of several videos depicting descriptions of Czeponis' abuse. *Id.* at ¶ 38 (quoting *DeBella*, 233 P.3d at 669); *see also People v. Johnson*, 2016 COA 15, ¶¶ 38-40 (district court did not abuse its discretion when it imposed certain restrictions and controlled access to the videotaped interview); *People v. Smalley*, 2015 COA 140, ¶¶ 64-68 (district court properly exercised its discretion when it waited for the jury to request the recorded calls, sought input from counsel, assessed the benefits of the exhibits to the jury and whether it would cause undue prejudice, and then crafted a limiting instruction); *cf. Jefferson*, ¶ 38.

¶ 54 The jury reached a split verdict as to A.S., acquitting Czeponis of third degree assault (choking). This split verdict further suggests that the jury was not unduly prejudiced by viewing A.S.'s forensic video. *See People v. Larsen*, 2017 CO 29, ¶ 16 (An improper use of

prejudicial information "would have been reflected by across-the-board guilty convictions.").

## IV. Conclusion

¶ 55    The judgment is affirmed.

JUDGE FOX and JUDGE SCHOCK concur.