The PEOPLE of the State of
Colorado, Petitioner,

v.

Claire Christine WELSH, Respondent.

No. 02SC340.

Supreme Court of Colorado,
En Banc.

Dec. 8, 2003.

Ken Salazar, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Paul Koehler, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorney for Petitioner.

David S. Kaplan, Colorado State Public Defender, Karen N. Taylor, Deputy State Public Defender, Denver, Colorado, Attorney for Respondent.

Justice RICE delivered the Opinion of the Court.

The People seek review of the court of appeals' decision in *People v. Welsh*, 58 P.3d 1065 (Colo.App.2002). A jury convicted the defendant of first degree murder after rejecting her defense of not guilty by reason of insanity. The defendant appealed, arguing that the trial court erred in admitting testimony regarding her pre-arrest silence as substantive evidence of her guilt because such evidence violated her privilege against self-incrimination. The court of appeals agreed, ruling that the Fifth Amendment right to be free from self-incrimination includes the right to pre-arrest silence, and that it was reversible error to allow testimony regarding the defendant's silence several hours after the killing. *Welsh*, 58 P.3d at 1070–71. The People now appeal that ruling.

We granted certiorari on the issues of whether a defendant's pre-arrest silence is admissible as substantive evidence of guilt or, in the alternative, whether such evidence is admissible to impeach the credibility of a defendant who has pled not guilty by reason of insanity.[1]

Applying only evidentiary principles, we hold that the defendant's silence had virtually no probative value as rebuttal testimony, rendering it inadmissible as logically irrelevant under Colorado Rule of Evidence ("CRE") 401. Moreover, even attributing to the evidence whatever minimal probative value one might argue it had, the potential for unfair prejudice that such testimony might cause rendered the evidence inadmissible under CRE 403. Therefore, we do not reach the constitutional issue of whether admission of a defendant's pre-arrest silence as substantive proof of guilt violates the Fifth Amendment privilege against self-incrimination.

We further hold that the defendant's pre-arrest silence was not admitted or used for impeachment purposes, but rather that the defendant's silence was used throughout the trial as substantive evidence of her sanity. Moreover, the defendant's silence was inadmissible for impeachment purposes because it did not sufficiently contradict the defendant's later statements to mental health experts that she did not recall the shooting.

---

1. We granted certiorari on the following issues:
 1. Whether evidence of a defendant's pre-arrest silence is admissible as evidence of her guilt.
 2. In the alternative, whether evidence of a defendant's pre-arrest silence is admissible to impeach the credibility of her statements to mental health experts where the defendant has pleaded not guilty by reason of insanity.

■ Thus, we now affirm the court of appeals' reversal of the defendant's conviction, remand to the court of appeals and direct it to remand to the trial court with instructions to exclude all testimony regarding the defendant's pre-arrest silence.[2]

## I. Facts and Procedural Background

### A. The Shooting and Its Aftermath

On the morning of January 12, 1997, the defendant shot and killed Jack Mileski, a man who was her boyfriend but had been attempting for several months to break off their relationship. Sometime later that day, the defendant shot herself twice, once grazing the top of her head and once through the left side of her chest. That evening at around 7:00 p.m., the defendant called her cousin and asked her to come over to Mileski's apartment and call 911. The cousin arrived to find the defendant in the fetal position on the floor, naked and covered with blood, and Mileski lying still in the bedroom with a gun resting on his chest.

Although, at trial, the defendant did not deny committing the actual act of killing Mileski, she did raise the defense of not guilty by reason of insanity. In doing so, the defendant put her mental state at the time of the killing in issue. Colorado law defines a legally insane person as follows:

[a] person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act . . . or . . . who suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a

culpable mental state that is an essential element of the crime charged.

§ 16–8–101.5(1), 6 C.R.S. (2003).

Because the defendant pled not guilty by reason of insanity and demonstrated some evidence of insanity, the People were required to prove beyond a reasonable doubt that the defendant was sane at the time she committed the killing. § 16–8–105.5(2), 6 C.R.S. (2003). In an attempt to satisfy that burden, the People introduced the following evidence describing the defendant's behavior in the hours following the shooting.

Edward Winters, an emergency medical technician for the fire department, arrived early at the crime scene, where he treated the defendant's injuries. According to Winters, the defendant was able to provide her first name, but did not reply when he asked her where she was hurt and did not reply to any other questioning in his presence.

Officer Lee Daffin was one of the first police officers dispatched to the scene and rode in the ambulance with the defendant in order to gather further information regarding the shooting. According to Officer Daffin, the defendant was "very clear" when asked about basic biographical information, and was able to give her own name and age as well as the name of Mileski. Yet Officer Daffin further testified:

Whenever I would ask any other questions regarding how did you get injured, how did the other person get injured, trying to get suspect information, she would not answer, she would fade out. She would look at the ceiling.

Despite trying several times to ascertain this information, Officer Daffin testified that the

---

**2.** We use the term "silence" to describe the defendant's conduct at the apartment and at the hospital, including her failure to answer questions entirely as well as her response to a detective that she did not wish to make a statement because she was afraid that she might say something wrong. In treating all of this behavior as silence, we join those courts which have treated various forms of non-responsive or uncommunicative conduct as silence for purposes of analyzing its admissibility under either constitutional or evidentiary principles. *See, e.g., Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (analyzing the defendant's post-arrest, post-*Miranda* statement that he un-

derstood his rights and would not make a statement without first speaking to an attorney); *People v. Mares,* 705 P.2d 1013 (Colo.App.1985) (treating the defendant's refusal to make a written statement prior to arrest as silence); *Florida v. Burwick,* 442 So.2d 944 (Fla.1983) (treating as silence the defendant's post-arrest, post-*Miranda* statements that he understood his rights, that he chose to remain silent, and that he wished to speak to an attorney). *But cf. Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980)(refusing to treat as "silence" two inconsistent descriptions of events given by the defendant after his arrest).

defendant would "immediately clam up" at every such question.

Nurse Tate Ulrich was on duty in the emergency room that night at around 8:00 p.m. when the defendant was brought in with a gunshot wound to her chest. According to Nurse Ulrich, the defendant was able to provide her name and her understanding that she was in a hospital, but looked away and did not answer when asked by Nurse Ulrich and other hospital personnel about what had happened at the apartment.

Nurse Faith Young was working in the Intensive Care Unit ("ICU") when the defendant was brought up from the emergency room at about 9:00 p.m. that evening. According to Nurse Young, the defendant responded to basic admission questions, inquired about her own vital signs, and discussed her own life throughout the evening. Nevertheless, when Nurse Young discovered the defendant's gunshot wound on her scalp, the defendant did not respond to questions regarding what had happened.

Detective Patrick Crouch arrived at the crime scene at around 9:15 p.m. that night and later went to the hospital to interview the defendant. According to Detective Crouch, the defendant did not acknowledge his presence when he entered her room in the ICU. The defendant also did not respond to a series of questions regarding what had happened at the apartment, including whether someone had entered the apartment or whether she had shot herself. Eventually, Detective Crouch asked the defendant if she understood the questions she was being asked, "and she responded to that question by saying she didn't want to make a statement at this time because she might say something wrong."

Finally, Elinor McGarry, a crime scene analyst, was sent to the hospital in order to process the defendant at approximately 10:00 p.m. According to McGarry, the defendant was able to answer basic questions including whether she was right or left handed, and was able to have a conversation regarding her occupation as a physical therapist and her hobbies of rock and ice climbing. McGarry also testified that when asked what

had happened, the defendant simply did not respond.

Thus, the prosecution presented testimony from six witnesses regarding the defendant's overall ability to answer biographical questions and engage in some level of conversation, as well as her non-responsiveness to questions regarding what took place at the apartment.

### B. Pre–Trial Motions Hearings

There were two pre-trial motions hearings concerning the admissibility of this evidence. At the hearings, both the defense and prosecution made arguments concerning the relevance, under CRE 401, and the danger of unfair prejudicial impact, under CRE 403, of testimony regarding the defendant's uncommunicativeness. Defense counsel contended not only that testimony regarding the defendant's non-responsive behavior was not relevant under CRE 401, but also that its admission "would create a 403 problem, clearly prejudicial to this case and may cause the jury to speculate to the reasons why she didn't respond."

The prosecution countered that the defendant's non-responsiveness tended to prove that, because the defendant chose not to answer certain questions, she therefore was legally sane at the time of the shootings. The prosecution argued:

> It was only when the question was asked, what happened, who shot you, things like that she remained silent. And the probative value of that is we have to prove she knew right from wrong at the time this crime was committed. That is very good evidence she knew right from wrong, she chose not to answer those particular questions. And if the Court would admit it for those limited purposes, we think we need [a] limiting instruction [as to] why that evidence is coming in.

The trial court found that the defendant's non-responsiveness to police questioning would be admissible only *"on rebuttal* if somebody gets up and says something about ability to observe and respond, at that point in time [the defendant's non-responsiveness]

would be admissible."[3] (emphasis added). The trial court also ruled that the defendant's statement to Detective Crouch that she did not want to say something wrong was admissible because it was a pre-arrest interview that was non-custodial and non-coercive. Given this distinction between the defendant's statement and her silence, the trial court presumably relied upon the Fifth Amendment privilege as the basis for its admissibility determination. However, because we find that both the statement and the silence are equally inadmissible as irrelevant under our evidentiary analysis, we do not make any distinction between the two forms of evidence in our holding.

At trial, the court failed to follow its own limitation of the evidence regarding the defendant's silence for rebuttal purposes only, and instead allowed the testimony in from the very outset.[4] The prosecution made references to the defendant's silence in its opening statement and proceeded to call the six witnesses discussed above to testify to that silence in its case-in-chief. Although the defense counsel maintained its objection to such testimony, the prosecution argued that the evidence was going to come in "any way you look at it" and that it would be inconvenient to have the witnesses return for rebuttal. Defense counsel conceded that despite its objection, "for the purposes of uniformity and their own continuity, they can ... bring the evidence now." Thus, the trial court allowed the prosecution to repeatedly reference the defendant's silence in its case-in-chief, without any limiting instruction regard-

ing such evidence, whether it be for impeachment or rebuttal purposes.

## C. The Insanity Testimony at Trial

The defendant argued that she was unable to distinguish between right and wrong at the time of the killing, and therefore should be found not guilty by reason of insanity. In support of this position, the defense introduced evidence regarding the defendant's mental, physical, and emotional deterioration in the months before the shooting.

The defense also presented expert testimony regarding the defendant's insanity at the moment of the killing. A licensed clinical social worker and a psychologist both testified that the defendant was severely depressed, perhaps psychotically so, and showed highly suicidal tendencies. A psychiatrist concurred with those findings, diagnosed the defendant as having dissociated at the moment of the shooting, and concluded that the defendant lacked the ability to form the intent to kill or to distinguish between right and wrong at the moment she shot the victim. The psychiatrist further opined that the defendant began to come out of her dissociative state that same day, most likely at the moment she shot herself through the chest, and therefore was no longer dissociating by the time she was interviewed by police and medical personnel.

In order to refute the defense of not guilty by reason of insanity, the prosecution relied upon the testimony regarding the defendant's uncommunicativeness as tending to es-

3. Shortly after the trial judge ruled on the admissibility of this testimony, one of the prosecutors asked for clarification as to whether the ruling limited admissibility of her non-responsiveness altogether, or whether it only applied as to her silence in the face of police questioning. The judge replied, "If otherwise proper, I think you would know I was talking about police officer[s]." Thus, the judge's ruling did not place any limitation on the testimony from medical personnel regarding the defendant's silence. However, we do not make this same distinction between the testimony of police and that of medical personnel.

4. Prior to trial, the prosecution stated its intent to address the defendant's non-responsiveness in its opening statement, and asked the trial court for an amended ruling on whether the issue of

insanity had been sufficiently raised so as to allow this comment. The trial court's ruling seemed to suggest that such a comment was inappropriate without actually prohibiting the prosecutor from making it:

> [The] problem is ruling out of context, without knowing what you are going to say. I don't know. I think you have to be awful cautious about that ... I think you could certainly say to the jury, we'll be considering various statements that were made and weren't made ... But as far as being specific statements, the refusal to speak at that time, I don't know. Chances are it is going to come in. We have to have the foundational stuff before it comes in ... Obviously, it is going to be raised[.] I feel more comfortable and you guys are safer for appellate purposes to do it that way.

tablish her awareness that she had done something wrong.[5] Additionally, the prosecution produced expert testimony that the defendant was legally sane at the time of the killing.

The prosecution's psychiatrists determined that the defendant was severely depressed and that she had a borderline personality disorder, but concluded that she probably was not psychotic. One prosecution psychiatrist speculated that if the defendant had truly dissociated and did not remember the killings, she likely would have inquired about what had happened rather than remained silent. Nevertheless, that psychiatrist agreed with the other prosecution experts that even if the defendant did in fact dissociate and genuinely experience memory loss regarding the shooting, she was capable of distinguishing right from wrong and of forming the intent to kill, and therefore was legally sane at the time she shot the victim.

Thus, it appears that the prosecution experts who testified as to the defendant's sanity at the moment of the killing did not rely in any meaningful way upon the defendant's non-responsiveness several hours later. Additionally, the key expert for the defense suggested that the defendant's dissociative state, the very foundation for her insanity defense, likely lapsed before any of the testifying police or medical personnel interacted with her.

Because the defendant's sanity at the moment of the killing was the central issue at trial, we must consider the evidentiary value of her silence within the context of this expert testimony.

## II. Discussion

The jury returned a guilty verdict, which was reversed by the court of appeals based primarily on the prosecution's use of the defendant's pre-arrest silence throughout the trial.[6] The People now argue that the court of appeals erred in reversing the defendant's conviction and in ruling the evidence of the defendant's silence inadmissible. Although we do not employ the same reasoning as the court of appeals, we agree with its result. We therefore affirm the court of appeals.

Our concern with the trial court's admission of the testimony for rebuttal purposes is three-fold. First, the trial court erred in failing to recognize that the defendant's uncommunicativeness had no relevance to her defense of insanity. The evidence lacked probative value so as to render it inadmissible under CRE 401, and its danger for unfair prejudice also required its exclusion under CRE 403. Second, the trial court erred in ruling such testimony admissible before it had any meaningful opportunity to determine what purpose, if any, the evidence would serve. Third, the trial court compounded its error of admitting the evidence for rebuttal purposes by failing to provide any such limiting instruction to the jury.

We also reject the People's argument that testimony regarding the defendant's silence might have been properly admitted for impeachment purposes. The evidence was not used to impeach the defendant's statements to mental health experts that she could not recall the shooting. Moreover, the trial court could not have admitted the testimony for that purpose, given that the defendant's silence several hours after the killing did not contradict her claimed defense of insanity.

For all of these reasons, we conclude that the trial court erred in admitting testimony regarding the defendant's non-responsiveness.

### A. Standard of Review

The Colorado Rules of Evidence set forth the standards governing the admissibility of

---

**5.** In Colorado, we utilize a unitary approach to the insanity defense. Under our statute:

The issues raised by the plea of not guilty by reason of insanity shall be treated as an affirmative defense and shall be tried at the same proceeding and before the same trier of fact as the charges to which not guilty by reason of insanity is offered as a defense.

§ 16–8–104.5(1), 6 C.R.S. (2003). Consequently, the prosecution presented its case regarding the defendant's sanity in anticipation of the defense's proffered evidence on the issue.

**6.** The court of appeals also found error in the trial court's admission of hearsay evidence to impeach one of the defendant's expert witnesses, but upheld the admission of evidence seized without a warrant under the inevitable discovery exception to the exclusionary rule. However, neither of those issues is before us on this appeal.

evidence and provide for considerable deference to the trial court's determinations. CRE 401 defines logically relevant evidence as that evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Such logically relevant evidence is generally admissible. CRE 402. Nevertheless, CRE 403 allows a trial court broad discretion to exclude otherwise logically relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."

A reviewing court may not reverse a trial court's decision to admit or exclude evidence absent a showing that the trial court abused its discretion. *People v. Gibbens*, 905 P.2d 604, 607 (Colo.1995); *People v. Dist. Court*, 869 P.2d 1281, 1285 (Colo.1994). When reviewing a trial court's admission of evidence in light of the balancing test of CRE 403, an appellate court must assign to the evidence the maximum probative value and the minimum unfair prejudice which a reasonable fact finder might attribute thereto. *Gibbens*, 905 P.2d at 607; *People v. Lowe*, 660 P.2d 1261, 1264 (Colo.1983). To overcome this presumption in favor of the trial court's ruling, the appellant must demonstrate that the decision was "manifestly arbitrary, unreasonable, or unfair." *People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993); *see also People v. Czemerynski*, 786 P.2d 1100, 1108 (Colo.1990).

Despite this policy of deference to the trial court's evidentiary determinations, we may not simply accept the lower court's rulings in all circumstances. The trial court must address any appropriate objection and articulate the reasoning for its decision. Specifically, the trial court should explain whether and how the evidence at issue is relevant to the case and, if so, to what extent that probative value might be outweighed by any unfair prejudice to the defendant. *People v. Honey*, 198 Colo. 64, 596 P.2d 751 (1979); *People v. Fernandez*, 687 P.2d 502, 504–05 (Colo.App.1984); *see also* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 401.03 (Joseph M. McLaughlin ed., 1997). Where a trial court fails to adequately perform this gate-keeping task, we may overturn its decision as an abuse of discretion. *People v. Snyder*, 874 P.2d 1076, 1080 (Colo.1994). With these standards in mind, we now turn to the evidentiary issues in the instant case.

## B. Rebuttal Evidence in General

Because the trial court limited the use of evidence regarding the defendant's silence to rebuttal purposes only, we now consider whether such use would be appropriate under the facts of this case. In doing so, we first examine the nature and purpose of rebuttal evidence, and then consider whether and how the use of the defendant's silence in this case might fit within that framework.

Rebuttal evidence is that evidence which tends to contradict the adverse party's case, whether it be challenging the testimony of a specific witness or refuting the adverse party's entire theory or claim. *People v. Trujillo*, 49 P.3d 316, 320 (Colo.2002). Unlike impeachment evidence, which is more focused on the credibility of an individual declarant, "[r]ebuttal evidence goes to the heart of the case, reflecting upon the truth of facts upon which the other side relies." *People v. Cobb*, 962 P.2d 944, 953 (Colo.1998) (Kourlis, J., dissenting). Thus, rebuttal evidence is essentially substantive in nature.

Rebuttal evidence is admitted at the trial court's discretion, and may take a variety of forms, including "any competent evidence which explains, refutes, counteracts, or disproves the evidence put on by the other party, even if the rebuttal evidence also tends to support the party's case-in-chief." *People v. Rowerdink*, 756 P.2d 986, 994 (Colo. 1988). In order to present rebuttal evidence, the offering party necessarily must demonstrate that the evidence is relevant to rebut a specific claim, theory, witness or other evidence of the adverse party. By its very nature, then, rebuttal evidence generally should be admitted after the adverse party has presented its evidence. *Trujillo*, 49 P.3d at 320. At the very minimum, a trial court must avoid making an admissibility determination before it has enough information to

conclude whether such evidence is relevant to rebut the adverse party's case.

■ Thus, where the prosecution seeks to rebut a defendant's claim or theory using evidence of the defendant's silence, it must clearly establish how that silence is relevant to that claim or theory. Here, in order for the prosecution to introduce evidence of the defendant's silence as rebutting her claim that she was legally insane, the prosecution must demonstrate how that silence renders more probable the fact that the defendant was legally sane at the moment she shot the victim.

### 1. Silence as Rebuttal Evidence

#### a. Legal Framework

The relevance of a criminal defendant's silence has been examined by the courts several times over the last few decades. The United States Supreme Court, addressing the use of an accused's silence at the initial police interrogation, noted that "[i]n most circumstances silence is so ambiguous that it is of little probative force." *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In that case, the prosecution relied upon evidence that the defendant was unresponsive to questioning regarding the source of money found on him, in order to impeach the defendant's testimony at his trial for robbery that he had an alibi and a legitimate reason for possessing the money. *Id.*

The Court ruled that proof of the defendant's silence was inadmissible as lacking probative value because the defendant's silence could just as "easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication." *Id.* at 177, 95 S.Ct. 2133. The Court further considered the prejudicial impact such evidence might have on the jury:

> Not only is silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted.

*Id.* at 180, 95 S.Ct. 2133. Thus, the Court ruled that evidence regarding the defendant's silence should have been excluded.

Other courts have reached similar conclusions, particularly within the context of an insanity defense. The Seventh Circuit ruled that post-*Miranda* silence was inadmissible to prove sanity, holding that use of the silence would violate the defendant's right to due process. *Thomas v. Indiana,* 910 F.2d 1413, 1414 (7th Cir.1990) (applying the United States Supreme Court's holding in *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986)). In a trial for murder, the prosecution introduced testimony that the defendant said nothing after receiving his *Miranda* warnings in order to show "that [the defendant] was reserved and quiet and not in a manic state." *Id.* In ruling that the admission of such testimony was unconstitutional, the court also commented on the minimal probative value of such evidence: "How mere silence—all we have in this case ... can be evidence of sanity puzzles us. Insane people frequently are withdrawn and uncommunicative; raving is not the only style of maniac." *Id.* Thus, although its holding ultimately rested on due process grounds, the Seventh Circuit clearly recognized the dubious evidentiary value of silence as it relates to making sanity more or less probable.

Relying on evidentiary principles, the Florida Supreme Court ruled that the prosecution could not introduce evidence of a defendant's post-arrest, post-*Miranda* silence and attorney request in order to rebut the defendant's claim of insanity. *State v. Burwick,* 442 So.2d 944 (Fla.1983). There, the defendant was charged with sexual assault, but claimed to have been insane and blacked out at the time of the crime. The prosecution introduced evidence that when arrested three hours after the incident, the defendant was non-responsive and requested his attorney. *Id.* at 946–47. In ruling the evidence inadmissible, the court combined constitutional with evidentiary considerations, but relied primarily on the reasoning of the United States Supreme Court in *Hale* that post-arrest, post-*Miranda* silence is inherently

ambiguous and has "dubious probative value." *Burwick,* 442 So.2d at 948.

Finally, in *People v. Wanke,* 311 Ill.App.3d 801, 244 Ill.Dec. 546, 726 N.E.2d 142 (2000), an Illinois appellate court ruled that a defendant's post-arrest but pre-*Miranda* silence and request for an attorney were inadmissible to prove the defendant's sanity at the time of the burglary. In order to defeat an insanity defense based in part on memory loss at the time of the charged robbery, the prosecution introduced testimony that upon arrest, just minutes after the crime took place, the defendant refused to answer questions and invoked his right to counsel. *Id.* at 144. Although the court rested its decision primarily on the defendant's privilege against self-incrimination, the court went on to comment on the minimal probative value of such evidence, noting: "Even though defendant might suffer from a psychiatric disorder that would render him legally insane, '[i]nsanity is not the equivalent of stupidity.'" *Id.* at 145 (internal citations omitted).

The court of appeals has previously explored the outer limits of relevance in the context of an insanity defense in *People v. Galimanis,* 944 P.2d 626 (Colo.App.1997), where it upheld a trial court's exclusion of testimony regarding the defendant's legal sanity two years prior to the killing as well as testimony regarding specific instances of the defendant's conduct at the state hospital in the years between the killing and the trial. In so ruling, the court observed:

> Traditionally, the scope of evidence admissible on the issue of insanity is broad. While it is proper to inquire into the mental condition of the defendant both before and after the commission of the act, the admissibility of evidence in an insanity trial depends on whether 'the inquiry bears such relation to the person's condition of mind *at the time of the crime* as to be worthy of consideration in respect thereto.'

*Id.* at 629, (quoting *Garrison v. People,* 151 Colo. 388, 392, 378 P.2d 401, 403 (1963)) (internal citations omitted) (emphasis added). Thus, while the fact-finding process calls for

the admission of all evidence relevant to a defendant's claim of insanity at the time of an offense, Colorado courts have always limited such evidence to that which is probative of the defendant's mental condition at the actual time of the crime.

Additionally, this court has addressed the probative value of a defendant's silence in the context of the affirmative defense of duress. *People v. Quintana,* 665 P.2d 605 (Colo.1983). Specifically, we considered whether the defendant's failure to make a statement upon arrest that he was forced at gunpoint to participate in a robbery tended to disprove his claim of duress. We concluded that the testimony regarding his silence should have been excluded "due to the many possible explanations for the defendant's post arrest silence." *Id.* at 611. We relied solely on the evidentiary principle that "[e]vidence that is so remotely related to an issue as to afford only conjectural inferences should not be admitted." *Id.* Thus, because we found that the defendant's silence in no way rendered his claim of duress more or less likely, we held the evidence to be irrelevant and inadmissible. *Id.*

■ In sum, when determining the admissibility of rebuttal testimony, particularly in the insanity context, a trial court must be vigilant in order to ensure that the well-established tenets set forth in CRE 401 and CRE 403 are satisfied. Evidence regarding a defendant's silence must therefore possess sufficient probative value as to the defendant's sanity at the time of the criminal act so as to exceed any unfair prejudicial impact that may be caused by the testimony. With this principle in mind, we turn to the instant case.

#### b. Application

■ Under the facts of this case, testimony regarding the defendant's uncommunicativeness was not proper rebuttal testimony because it was not relevant under CRE 401 and was unfairly prejudicial under CRE 403.[7]

---

7. In reaching this conclusion, we nevertheless recognize that there may be some cases where evidence of a criminal defendant's silence or non-responsive conduct may be highly probative on a material issue, including legal sanity. *See, e.g., United States v. Trujillo,* 578 F.2d 285, 288

The heart of the defendant's claim of insanity is that she temporarily dissociated at the precise moment that she shot Mileski. Although the key defense psychiatrist did rely somewhat on the defendant's lack of memory in finding that the defendant dissociated at the time of the shooting, that psychiatrist also opined that the defendant had come out of her dissociative state by the time she was interacting with police and medical personnel. Thus, under the defendant's theory, her non-responsiveness at the crime scene and at the hospital bears virtually no relationship to her claim that she did not remember the actual shooting, and therefore is irrelevant to whether she was sane at the moment she shot the victim.

Nevertheless, the People argue that the defendant's silence rebuts her claim that she did not recall the shooting, and therefore rebuts her insanity defense. However, the testimony of the People's own experts belies their argument. All of the prosecution's psychiatric experts concluded that the defendant was legally sane at the time she shot Mileski. Moreover, the prosecution's experts all agreed that their findings were in no way impacted by whether the defendant did or did not recall the shooting. Thus, under the prosecution's theory, the defendant's memory of the shooting, or lack thereof, bears virtually no relationship to her sanity at the moment of the shooting. As such, any purported link between the defendant's silence and her claim of memory loss was immaterial to the People's case.

We conclude that the defendant's silence does not render her sanity at the actual time of the criminal act any more probable than it would be without such evidence. Therefore, the evidence regarding her silence ought to have been excluded under CRE 401.

 Moreover, testimony regarding the defendant's silence ought to have been excluded under the CRE 403 balancing test, which allows a trial court to exclude otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." CRE 403. For example, a trial court should exclude evidence which has only the most minimal probative value, and which requires a jury to engage in undue speculation as to the probative value of that evidence. *See, e.g., People v. Franklin*, 782 P.2d 1202, 1206 (Colo.App.1989) (finding that the danger of unfair prejudice or confusion of issues outweighed the probative value of a hearsay statement, where the jury would have been required to reach a number of speculative assumptions about that statement in order to find any probative value). Furthermore, evidence should be excluded where it results in unfair prejudice, such that it calls for the jury to reach its decision on an improper basis. *See, e.g., People v. Nuanez*, 973 P.2d 1260, 1263 (Colo. 1999); *People v. Dist. Court*, 869 P.2d 1281, 1286 (Colo.1994).

Under these facts, the danger of unfair prejudice and the likelihood of misleading the jury far outweighed any possible probative value that testimony regarding the defendant's silence might have had. That the defendant did not respond to questions regarding the shootings at the victim's apartment is neither proof of her sanity nor inconsistent with her later claim of not remembering what happened. She may have been unable to respond due to a lack of memory, confusion, disorientation, or the pain of her own gunshot wounds. She may have been unwilling to respond due to her awareness of the criminal justice system or a fear of incriminating herself, even if she did not know or believe she had committed any crime.

(10th Cir.1978) (upholding the admission of testimony regarding a defendant's post-*Miranda* non-responsiveness as "disclos[ing] understanding and awareness," where the defendant had previously feigned an inability to speak English in order to avoid the interview); *People v. Jones,* 15 Cal.4th 119, 61 Cal.Rptr.2d 386, 931 P.2d 960, 992–93 (1997) (allowing the admission of testimony that the defendant told a nurse that his lawyers had advised him not to speak with the jail medical staff, because such evidence strongly contradicted the defendant's claim that his uncommunicativeness was caused by and proof of his mental illness), *overruled on other grounds by People v. Hill,* 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673 (1998). However, these cases are readily distinguishable from the facts before us.

As such, a jury easily could be misled by evidence regarding the defendant's uncommunicativeness. Given that even the psychiatric experts could not find any relevance in the defendant's behavior several hours after the shooting, the evidence had great potential for misleading the jury.

Moreover, the evidence likely had an unfair prejudicial impact in that it called for the jury to reach its decision regarding the defendant's sanity on an improper basis. Indeed, the prosecutor himself, in both his opening and closing statements, played on that possibility by reminding jurors that a person with no memory surely would have spoken up. Yet the People's own expert witnesses were unable to reach any sort of consensus that her silence was probative of her sanity, or, more importantly, that her purported dissociation and subsequent memory failure had any bearing on her legal culpability.

Thus, by relying on the defendant's silence throughout their case, the People encouraged the jurors to rely on their own conceptions about mental illness and to find the defendant legally sane based largely on her pre-arrest silence. The unfair prejudicial impact of admitting the testimony regarding the defendant's silence so far outweighed any minimal probative value that the trial court abused its discretion in admitting the evidence.

### 2. Timing

■■■■ Additionally, the trial court prematurely determined the admissibility of such testimony. Before admitting rebuttal testimony, a trial court must ensure that such evidence is relevant to refute or counteract the adverse party's case. *See People v. Rowerdink*, 756 P.2d 986, 994 (Colo.1988). Accordingly, a trial court must possess sufficient information regarding the adverse party's evidence or claims in order to properly determine whether the testimony is appropriate for rebuttal purposes.

At the time of the pre-trial hearing, it was unclear whether and how defense counsel might have raised the issue of the defendant's "ability to observe and respond." Rather, the trial court should have withheld

its admissibility determination until that time at which it became apparent that testimony regarding the defendant's silence tended to contradict the evidence put forth by the defense. In fact, the defendant's case did not rest upon her "ability to observe and respond" several hours after the killing, but instead focused on her dissociative state at the moment she shot the victim. Thus, the trial court erred in ruling on the admissibility of rebuttal evidence too early.

### 3. Limiting Instruction

■■■■ Finally, the trial court abused its discretion in allowing what it deemed rebuttal evidence to come in during the case-in-chief and in failing to provide any sort of limiting instruction as to the purpose of that evidence. When evidence is admissible for one purpose but not for another purpose, the trial court, "upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." CRE 105. At the pre-trial hearing on the admissibility of testimony regarding the defendant's uncommunicativeness, the prosecution argued that the evidence should be admitted to rebut the defendant's claim of insanity by proving that she knew right from wrong, and conceded that "if the Court would admit it for those limited purposes, we think we need [a] limiting instruction [as to] why that evidence is coming in."

The prosecution's concession that such an instruction was necessary put the trial court on notice that it was required to give a limiting instruction to the jury as to the purpose of the evidence. Nevertheless, the trial court provided no guidance to the jury as to the purpose of that evidence at the time it came in, nor did it include any limiting instruction regarding the defendant's nonresponsiveness at the close of trial. Rather, the jury was left to assign to such testimony whatever meaning the jury itself deemed appropriate.

### C. Silence as Impeachment Evidence

■■■■ Additionally, we reject the People's argument that evidence of the defendant's silence was properly admitted, not as

substantive rebuttal evidence of the defendant's sanity, but solely for the purpose of impeaching her later statements to mental health experts that she could not recall the shooting. In doing so, we examine the nature and purpose of impeachment evidence generally and then compare that with how the evidence was actually admitted below.

 The very essence of impeachment evidence is that it tends to cast doubt upon the credibility of a testifying witness. Indeed, "[t]he *sine qua non* of impeaching a witness' testimony is that the evidence contradicts his previous statements." *LeMasters v. People*, 678 P.2d 538, 543 (Colo.1984). Additionally, our rules of evidence provide that "[w]hen a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." CRE 806. In other words, where a defense witness testifies regarding a defendant's out-of-court statements, the prosecution may attack the credibility of the defendant by introducing testimony regarding other out-of-court statements which are inconsistent with those provided by the defense witness.

Here, mental health experts testified regarding the defendant's statements that she did not remember the actual shooting. Thus, according to the People, they may attack the defendant's credibility and impeach those statements using testimony regarding her silence on the night of the killing. The People's reliance on CRE 806, however, fails for several reasons.

First, at no point in the evidentiary hearings did the prosecution argue that its sole purpose in introducing the defendant's non-responsiveness was to impeach her later statements to the mental health experts who examined her. Rather, the prosecution argued that the defendant's non-responsiveness was "very good evidence she knew right from wrong," and therefore established that she was legally sane at the time of the shooting.

Moreover, the prosecution in no way limited its use of the evidence to impeachment, but instead cited the defendant's silence in its opening and closing statements, and examined six witnesses regarding the defendant's silence during its case-in-chief. The prosecution did not wait until testimony regarding the defendant's claimed inability to recall the event was introduced into evidence before seeking to impeach that testimony with the defendant's silence. Rather, the prosecution relied upon that evidence from the outset, all for the express purpose of proving that the defendant was legally sane when she shot Mileski.

 Finally, the People's impeachment argument fails because, regardless of whether the prosecution was impeaching the testifying witness or the hearsay declarant, such evidence must actually contradict the impeachable statement. Unlike those cases where a defendant's insanity defense has been impeached by proof of her prior inconsistent statements, the defendant's non-responsiveness does not contradict her later statements that she did not recall the shooting.

For example, a District of Columbia appellate court upheld the admissibility of the defendant's statements to the police the day after a murder. *Wilkes v. United States*, 631 A.2d 880 (D.C.App.1993). In that case, the defendant had told the police that he "did it," although he failed to specify what "it" was, and later described how he had disposed of the gun. *Id.* at 882. The court ruled that such statements were admissible for either impeachment or rebuttal purposes because they "directly contradict[ed]" his later statements to psychiatrists that he did not recall the murder. *Id.* at 889. Similarly, the West Virginia Supreme Court upheld the admissibility of the defendant's otherwise inadmissible but voluntary statements to police that they must have "talked to mama." *State v. DeGraw*, 196 W.Va. 261, 470 S.E.2d 215, 221 (1996). There, the defendant's mother testified that the defendant had told her that he had killed the victim shortly after the murder. *Id.* at 218. Once again, the court ruled that such statements could be used to counter a diminished capacity defense based on lack of memory because the defendant had directly acknowledged his culpability, and the statements demonstrated that the defendant

"did indeed have some memory as to the events surrounding the crime charged." *Id.* at 224.

Unlike the defendants in *Wilkes* and *De-Graw*, however, the defendant in this case never made any inculpatory statements to law enforcement personnel, nor did she say anything which can be described as inconsistent with having no memory of the shooting. Rather, she simply did not answer any questions regarding what took place at the apartment. Here, there is no direct contradiction between the defendant's silence after the crime and her later statements that she did not recall the shooting.

We reject the People's argument that the evidence of the defendant's silence was properly admitted for impeachment purposes. Instead, we find not only that the use of the testimony regarding her silence was not confined to impeachment in its presentation, but also that even if it had been so limited, it would not have been sufficiently contradictory to constitute impeachment of her statements that she could not remember the shooting.

### D. Harmless Error Test

Because we find that the admission of testimony regarding the defendant's silence in this case constituted an abuse of discretion by the trial court, we must now determine whether that error requires that we reverse the defendant's conviction. Under the harmless error test, we are directed to "disregard any error or defect not affecting the substantial rights of the parties." C.A.R. 35(e); *see also* Crim. P. 52(a) ("[A]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). Thus, unless we find that the error in admitting this evidence substantially influenced the verdict or affected the fairness of the trial, we may not upset the finding below. *See People v. Quintana*, 665 P.2d 605, 612 (Colo.1983); *see also Masters v. People*, 58 P.3d 979, 1002 (Colo.2002). If this influence is apparent, "or if one is left in grave doubt, the conviction cannot stand." *Quintana*, 665 P.2d at 612 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

In the instant case, we cannot say that the error in admitting testimony regarding the defendant's silence was harmless. The primary issue at trial was not whether the defendant shot the victim, but rather whether the defendant was legally sane at the moment she did so. While both sides presented conflicting expert testimony on the sanity issue, the People's own experts concluded that regardless of whether the defendant had actually dissociated at the time of the killing and therefore could not remember the act, they would have found her legally sane when she shot the victim. Moreover, only one of the many experts testifying speculated as to any potential inconsistency between the defendant's silence after the shooting and her claim of memory loss.

Despite the fact that the defendant's memory loss was deemed scientifically irrelevant by its own witnesses, the prosecution nevertheless sought to attack that issue throughout the trial by constantly reminding the jury of the defendant's silence at the apartment and at the hospital. The prosecution repeatedly implored the jury to base its decision on the defendant's failure to respond to questioning on the night of the shooting: referring to the defendant's silence in its opening statement, examining six witnesses on the issue in its case-in-chief, and directing attention to the defendant's silence again in its closing argument. Thus, we cannot say with confidence that the admission of this testimony did not substantially affect the defendant's rights.

Furthermore, the fact that the trial court allowed this evidence in throughout the People's case, without regard for the very limiting purpose which it had placed upon the majority of the testimony, certainly impacted the fairness of the trial proceedings. By introducing such testimony in its case-in-chief, the prosecution attacked the defendant's claim of memory loss before the defense had even raised the issue, thereby perhaps forcing the defense to respond as if the defendant's silence did refute her claim of insanity. Additionally, the unlimited use of the purported rebuttal testimony may have required the defense to allocate more time

and attention to the memory loss issue than it otherwise might have.

Thus, by failing to provide any limiting instruction, the trial court potentially impacted the weight attached to such testimony by the jury, compounding the fact that the evidence ought to have been excluded altogether. Certainly, considering the record as a whole, the error of admitting evidence regarding the defendant's silence and its resulting impact on the substantial rights of the defendant and the fairness of the proceedings cannot be deemed harmless.

## III. Conclusion

Based on the reasoning outlined above, we find that the trial court committed reversible error by admitting testimony regarding the defendant's silence at both the crime scene and the hospital. We do not by this decision establish a general rule that silence is per se inadmissible to establish guilt or sanity in all criminal trials; nor do we express any opinion on whether the use of pre-arrest silence violates the Fifth Amendment privilege against self-incrimination. Rather, we limit our decision to the very distinct facts before us.

Thus, we find that on the facts of this case, the defendant's failure to respond to questions regarding the shooting which had taken place several hours earlier was so lacking in probative value as to render it inadmissible under CRE 401. Moreover, the potential for unfair prejudicial impact, arising out of the likelihood that the jury would attach far greater weight to the evidence than was warranted, so far outweighed whatever probative value the testimony might have offered that all such evidence should have been excluded under CRE 403. Therefore, we hold that the trial court should have excluded all evidence regarding both the defendant's silence to police and medical personnel and her statement that she did not wish to answer for fear of saying something wrong.

We now remand this case to the court of appeals with instructions to remand to the trial court for a new trial in accordance with the views expressed herein.

Justice COATS dissents, and Justice KOURLIS joins in the dissent.

Justice COATS dissenting:

For a patchwork of reasons, the majority concludes that allowing the jury to consider the defendant's refusal to answer certain inquiries from emergency response and medical personnel about what happened to her deprived her of a fair trial and required the reversal of her conviction for first degree murder. Finding it unnecessary to even reach the question whether she had a constitutional privilege to remain silent, the majority instead upholds the court of appeals reversal on the far broader ground that the defendant's refusal bore no logical relationship to her state of sanity only hours earlier and therefore was irrelevant. Because I strongly disagree with the majority's rationale, as a matter of logic as well as law, and because I would hold that the Fifth Amendment privilege against self-incrimination extends beyond the courtroom only to custodial interrogation, I would reverse the court of appeals and order the defendant's conviction reinstated. I therefore respectfully dissent.

In my view, neither the majority's characterization of a choice not to answer select questions as "silence," nor its announcement that such silence is inherently ambiguous and therefore irrelevant, is supported by the authorities upon which it relies or by basic human experience. Even more fundamentally, however, I consider the majority's analysis of relevance to be flawed from its inception by its mistaken presumption that the defense of insanity is complete upon expert determination of the existence of a mental disease or defect. While I also find unjustified the degree to which the majority minimizes the significance attributed to the defendant's selective responses by prosecution psychological experts, *see* maj. op. at 303 its more fundamental shortcoming, in my opinion, lies in treating the defendant's capacity to distinguish right from wrong, as well as her capacity to kill intentionally and deliberately, as a matter of scientific expertise. *See* maj. op. at 310. Finally, I consider the ma-

jority's criticisms about timing and the lack of limiting instructions to be little more than quibbles over the trial court's discretion to determine the appropriate order of evidence and defense counsel's control over defense tactics.

Perhaps the most startling, and potentially far reaching, aspect of the majority's rationale is its conclusion that the defendant's decision to answer some, but not other, questions had no tendency whatsoever to make it more probable that she was sane at the time she pulled the trigger than would be the case without that evidence. Maj. op. at 306 (relying on CRE 401). This statement clearly has less to do with law than with logic and basic human experience. Because the defendant pled that she was not guilty of first degree murder by reason of insanity, the prosecution was required, as a matter of law, to rebut her claim, raised by plea, that she could neither appreciate the wrongfulness of her conduct nor act intentionally and deliberately due to a mental disease or defect. At the very least, the majority necessarily holds that a reasonable juror could not logically infer anything about the defendant's awareness of the wrongfulness of her conduct from her refusal to tell emergency personnel what happened to her.

We have, of course, previously recognized that silence may be ambiguous and in certain circumstances so ambiguous as to be insufficiently probative of any material fact to overcome other policy limitations on admissibility. *See People v. Quintana*, 665 P.2d 605, 610–11 (Colo.1983) (narrowly rejecting defendant's failure to make a statement to police upon arrest as evidence of guilt, where he elected not to testify at trial). We have never suggested, however, that susceptibility to alternate explanations alone renders silence inadmissible. It has long been recognized that in the face of an accusation of wrongdoing, and other situations in which the natural reaction would be to speak out in response to a statement or question, silence may indeed have some probative value. *Id.* at 610; *see also Lothrop v. Union Bank*, 16 Colo. 257, 261, 27 P. 696, 698 (Colo.1891); *see generally* Herbert Broom, A Selection of Legal Maxims 137 & 787 (8th American ed. 1882) (*Qui*

*tacet consentire videtur*, "Silence implies consent.").

The authorities relied upon by the majority largely stand for the proposition that declining to answer in the face of interrogation by law enforcement officers, when there exists a constitutional right to do so and especially after the person being interrogated has just been warned of that right, cannot reasonably be understood as having been motivated by consciousness of guilt any more than as simply taking advantage of a legal right. In addition to resting their holdings on the existence of a constitutional privilege rather than on the irrelevance of silence (as the majority does in this case), those authorities would not clearly treat the defendant's selective refusal to respond as electing to remain silent. *See Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980); *Quintana*, 665 P.2d at n. 7.

To the extent that the majority opinion can be read to find a lack of probative value only because the defendant's "silence" was not precisely contemporaneous with the killing, it is similarly without support. Any suggestion that evidence of sanity hours before and after committing a criminal act is not even remotely probative of sanity at the time of the act flies in the face of both common sense and specific expert testimony in this case. And authorities rejecting evidence of a defendant's sanity years before or after the criminal act in question can hardly be considered to the contrary. *See* maj. op. at 306 (relying on *People v. Galimanis*, 944 P.2d 626 (Colo. App.1997)).

Apart from the clear connection between the defendant's choice not to give certain answers and her appreciation of the situation, her interaction with the officers was expressly relied upon by prosecution psychological experts in concluding that she did not dissociate at the time of the killing. While agreeing that the defendant was depressed and suffered from a borderline personality disorder, the lead prosecution expert concluded that she was sane when she killed the victim. Offering his expert opinion that psychosis is not a fleeting thing that would last such a short time, he expressly relied on indications of the defendant's organized

thinking and behavior, both before and after, as evidence rebutting her claim of dissociation at that precise moment of the killing.

Evidence at trial (largely through the defendant's own statements) indicated that the defendant tried to buy a gun a day and a half before the killing but was turned down for lack of any Colorado identification. The gun dealer helped her locate the appropriate state facilities, and when she returned the next day with a state identification card, he sold her a handgun and gave her five hollow-point bullets. She hid the gun in her car and retrieved it the next morning. She arose about 3:00 or 4:00 a.m., while the victim was asleep, dressed herself, drank some beer, and drove her car to her cousin's house, some six blocks away. She then walked back to the victim's apartment, loaded the gun with the hollow point bullets, disrobed, and got into bed with him. Although it was undisputed that she shot and killed the victim sometime later, the precise time of the killing was never established.

The victim was killed by one gunshot to the back of his head while he was lying in bed. His body was rolled over, and the gun was placed on his chest. Before placing the gun, however, the defendant shot herself. About 7:00 p.m., the defendant dialed her cousin and upon learning that she was at her sister's house, dialed that residence in turn. The victim asked her cousin to come over but specifically admonished her not to call 911 until she arrived. Upon arriving, the cousin found the defendant on the living room floor and the victim in bed. Believing that the victim had passed out, the cousin had her sister call 911 and report that she was with a shooting victim and that there was a man in the bedroom with a gun to his head.

The first officer on the scene immediately asked about the location of the suspect, and although the defendant did not respond, her cousin indicated that he was passed out in the bedroom. The officer entered the bedroom with his gun drawn and eventually determined that the victim was dead. Thereafter, three detectives, a fireman, a crime scene analyst, and a nurse asked the defendant who shot her. Although she answered questions about her address, offered bio-graphical information, and advised firemen at least twice not to lay her on her back for fear of causing bleeding or draining, she either did not respond to questions about who shot her or answered that she did not wish to respond for fear of saying something wrong or making a mistake. Only about three hours later, after the police found a gun box in her car and other evidence linking her to the shootings, was she arrested for murder.

The prosecution's lead psychological expert observed that the defendant's activities leading up to these events and her contact with the officers after the shootings revealed a level of organized thinking that contradicted her claim of insanity, and he gave as examples several factors upon which he based his opinion. He noted that she was organized enough to buy a gun, load a gun, and point a gun; that she lied to the gun salesman about her reasons for purchasing the gun, whether they were, at that time, suicide or homicide; that she was persistent enough to obtain a Colorado identification; that she was able to remember two different phone numbers after the shootings and successfully reach her cousin; and that she had the ability to place the gun on the victim's chest after the shootings, all of which demonstrated some ability to remember important things and know that she was in trouble.

When asked specifically about the importance of the defendant's failure to answer questions about what happened, despite her ability to answer other questions, the psychiatrist made clear that it was a factor in his considerations, like her placement of the gun, and explained in detail that although the defendant's state of mind hours later was not dispositive, he considered it relevant to the existence or non-existence of psychosis at the time of the actual killing. He also offered that in partial reliance upon these factors, he found no psychosis, either before or after the killing. A second prosecution expert even more expressly credited the defendant's selective failure to respond to inquiries about the shootings as being important to his assessment of sanity. He discredited the defendant's later explanations of confusion and lack of memory about what had happened on the grounds that her failure to at least in-

quire about what happened or express surprise about being shot was contrary to what one would expect to find in the event of actual dissociation.

Although the prosecution experts did not consider the defendant's choice to answer only certain questions dispositive in itself, they clearly considered it relevant to the question of psychosis by helping to demonstrate a pattern of organized thinking shortly after the killing. Perhaps in recognition of the tenuousness of its broad holding that this behavior could have no probative value whatsoever, the majority alternatively asserts that if it could have some probative value, its admission would nevertheless amount to an abuse of discretion and require reversal for various policy reasons. *See* maj. op. at 303–304 (relying on CRE 403).

While the majority is clearly aware of the tremendous deference to which trial court rulings of relevancy are entitled, requiring that reviewing courts assume the maximum probative value and minimum prejudicial effect that admitted evidence could possibly have, *see* maj. op. at 304, it finds that the danger of misleading the jury by permitting it to consider the defendant's refusals was too great. Unlike evidence of unrelated bad character or uncharged criminal misconduct that might cause a jury to dislike and penalize a defendant for reasons other than actual belief in her guilt, the majority apparently considers the evidence here objectionable because there are possible explanations for the defendant's conduct that would not be probative of her sanity.

Even if the defendant's selective refusal to answer were relevant only insofar as it was motivated by self-interest and appreciation of the wrongfulness of her conduct, it should nevertheless have been admitted as long as there was evidence to support a jury finding of such motivations. *See* CRE 104(b). Although the jury might have legitimately found otherwise, in my view there was clearly evidence, including the testimony of the prosecution experts, from which the jury could find that the defendant's refusals were not caused by confusion or lack of memory, as she later claimed, but rather by conscious design. More importantly, however, to the extent that the defendant's choice of questions to answer, in conjunction with all of the other factors noted by the prosecution psychological experts, evidenced her organized thinking so soon after the killing, it was actually probative of an absence of dissociation or psychosis.

Although a plea of not guilty by reason of insanity includes a plea of not guilty, and the prosecution was required to prove the commission of the offense as well as rebut the defense of insanity, it was clear from defense disclosures and the defendant's psychological evaluations by both defense and prosecution experts that the only contested issue at trial would be the defendant's state of mind. In addition to being a matter of trial court discretion, which was agreed to by the defense in any event, the order of evidence in this case was therefore inconsequential. Similarly, because the only contested issue at trial was the defendant's state of mind, an instruction limiting admission of her selective responses to that purpose alone would have been virtually meaningless, but in any event was agreed to by the court in limine. Defense counsel, however, never made a request with regard to any specific testimony and never tendered any such instruction at the close of the evidence.

I find it important that the majority does not reverse this first degree murder conviction in order to vindicate any constitutional privilege or protect the defendant from any inflammatory evidence. It reverses solely because it believes the jury was permitted to hear irrelevant evidence, which it may have (apparently like the prosecution's psychological experts) mistakenly considered, in conjunction with the defendant's other actions immediately after the killing, probative of her sanity. The trial of the defendant's sanity plea included forty-eight witnesses, five of whom were psychological experts. There are good reasons for treating evidentiary rulings, particularly those involving relevance, as discretionary with the trial courts, and for formally limiting reviewing courts from acting as super trial courts. Because I consider the majority's decision today an unwarranted intrusion into matters more properly left to juries and trial courts, I respectfully dissent.

I am authorized to state that Justice KOURLIS joins in this dissent.